## CODY JEANNE SPARKS, Appellant, v. THE STATE OF NEVADA, Respondent.

### No. 17860

June 30, 1988                                              759 P.2d 180

*Morgan D. Harris,* Public Defender, *Deborah J. Lippis,* Deputy Public Defender, and *Herbert F. Ahlswede,* Deputy Public Defender, Clark County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, and *Ronald C. Bloxham,* Deputy District Attorney, Clark County, for Respondent.

*Laura FitzSimmons* and *Lambrose, FitzSimmons & Perkins,* Carson City, for Nevada Trial Lawyers Association, Amicus Curiae.

# OPINION

*Per Curiam:*

Cody Jeanne Sparks, the appellant, was convicted of the second degree murder of her father, Ralph Sparks, with the use of a deadly weapon.

Appellant raises four issues which we feel merit our attention and necessitate reversal of the conviction. These assignments of error are directed to (1) the State's mishandling of evidence, (2) the exclusion of hearsay testimony which was against the declarant's penal interests, (3) the limitation of the testimony of appellant's psychiatrist to responding to prepared hypotheticals, and (4) the district court's rejection of a negotiated plea bargain agreement.

Appellant's theory of the case was that she had killed in self-defense and/or as a result of temporary insanity. The day after the discovery of Ralph Sparks' body, and subsequent to appellant's initial denial of any involvement in the homicide, appellant confessed to killing her father in self-defense. Appellant then gave a statement to the police, which was consistent with her testimony at trial. She testified to her father's acts of physical and sexual abuse which began when she was just eight years old.

Appellant's mother and father separated when she was a young teenager, and Cody lived with her mother in Las Vegas. On August 18, 1984, Cody's mother died from cancer. At that time Cody was eighteen years old, and had not lived with her father for six years. Ralph Sparks then moved back into the home with Cody. Cody testified that on August 22, 1984, only four days after her mother's death, her father tied her up with a rope and abused her both physically and sexually. During the forthcoming months, he burned her hair and back with cigarettes and poked her with needles and a golf-shoe, spike wrench.

Appellant then focused her testimony upon the homicide and the days preceding it. On Wednesday, February 28, 1985, her

father came home intoxicated. She was asleep in her bedroom when her father entered the room. He then sat on her, hit her repeatedly in the face, held a gun to her head, and forced her to have sex. On Saturday, March 2, her father broke through her bedroom door with gun in hand, but Cody was able to defend herself. They fought throughout the house. Finally tiring, Ralph Sparks ended his attempt to sexually assault his daughter. However, as he was driving appellant to her job later in the evening, he stabbed her repeatedly with a fingernail file. This abuse, coupled with the abuse of prior months, left obvious marks, burns and bruises which were apparent to the police officer who interrogated Cody following the homicide.

Cody testified that at 10:00 p.m. on Sunday, March 3, she was waiting for her father to come home so that he might drive her to work. When he arrived he was drunk and entered her bedroom carrying the gun. With the gun to her head, he held her down and ordered her to undress, threatening to "blow [her] head off" if she did not comply. They wrestled to the floor where her father hit her in the face with the gun. Cody, however, was able to escape momentarily to the living room, but her father pursued her, cocked the gun (which he had done before), and threatened to kill her if she did not return to the bedroom.

In response, Cody picked up a tire iron which was leaning against a nearby chair. She threw it at her father, who was standing but five feet away, hitting him in the head. The fight then continued throughout the house and ended only when she was able to take the tire iron from her father and hit him repeatedly while he was on the floor. Cody testified that as her father lay on the floor moaning—obviously subdued—she picked up the gun which had been dropped in the hallway during the fight, put it in the closet in its felt bag, and drove herself to work.

### Mishandling of Evidence

The police found a loaded .357 caliber handgun at the crime scene in a felt bag in the master bedroom closet. The police visually examined the gun and bag for blood and hair; neither were observed, and no chemical tests were performed. Although initially booked into evidence, the gun and bag were released within the month (March of 1985) to Michael Sparks, the victim's son. Thereby, the State broke its chain of custody although it was well aware of appellant's claim of self-defense and the integral part the gun played in her relation of the events.

The gun was not retrieved and rebooked into evidence until August 1, 1985. Although the State's examination of the gun in August revealed no blood and only unidentified fingerprints not belonging to appellant or the victim, it is clear that the break in

the chain of custody may have resulted in the loss of such evidence. In fact, in its appellate brief the State admitted, "it is possible that there were prints and blood on the gun tending to support defendant's case theory. It is also conceivable that the State's procedures resulted in loss of that evidence." We agree.

A conviction may be reversed when the State loses evidence if (1) the defendant is prejudiced by the loss or, (2) the evidence was "lost" in bad faith by the government. Howard v. State, 95 Nev. 580, 582, 600 P.2d 214, 215-216 (1979). Appellant alleges that she has been prejudiced, and it is her burden to show "that it could be reasonably anticipated that the evidence sought would be exculpatory and material to appellant's defense." Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 108 (1979). In describing this test of materiality, the Supreme Court in United States v. Agurs, 427 U.S. 97, 112-113 (1976), stated that the lost evidence "must be evaluated in the context of the entire record." The question is whether when so evaluated a reasonable doubt exists which was not otherwise present.

There were no witnesses to the homicide. Appellant's claim of self-defense rested, almost exclusively, on her own testimony. Blood, hair, or fingerprints if found on the weapon would have been critical, corroborative evidence supporting her testimony. Furthermore, we must evaluate the potential effect of the lost evidence in light of the State's opening and closing comments in which the State argued that the lack of fingerprints and blood on the gun supported the State's theory, that the gun was not used and appellant was not acting in self-defense.[1] The State cannot be allowed to benefit in such a manner from its failure to preserve evidence.

---

[1]In the opening, the State began:

Ladies and Gentlemen, there are a number of inconsistencies in her statement. For example, the gun that's dropped on the floor, is cocked. She says she never uncocked it; didn't know how. The gun found in the house is uncocked. *And there is no blood on the gun.*

(Emphasis added.)

In closing, the Prosecutor argued:

Well, ladies and gentlemen, the defense, at any time, could have had that weapon tested, also. The State took the step, when it came to our attention in August of 1985, that we should have that gun re-examined. It had been examined by Mr. Horn the night he processed the crime scene. But, let's take the fingerprints, let's do a little more. The State took those steps. And had blood been on there, had fingerprints of Cody Sparks been on there, you would know about it. You would know about it. But they weren't, they weren't.

. . . .

She talks in terms of a gun. Ladies and gentlemen, the gun is not

The State admits that its break in the chain of custody may have resulted in the loss of material evidence. However, not only would the loss of such evidence be prejudicial, but the State buttressed its case by the absence of that evidence. As the State's action cannot be corrected, we hold that the conviction must be reversed and all charges dismissed.

### Statements Against Penal Interest

Appellant attempted to proffer the testimony of K. D. Brown who was an acquaintance of Ralph Sparks. Brown and Sparks were fellow golfers, pool players, and bartenders. The defense sought to introduce statements made by Ralph Sparks which were against his penal interest when made. The State objected, and an offer of proof was made. The defense stated that if allowed to testify, Brown would state that Sparks had vulgarly asked him when Brown would start having sex with children instead of women. Brown would also testify that on a separate occasion, when riding together in a car, Sparks coarsely boasted of having sex with his daughter since she was a little girl.

The appellant offered this testimony pursuant to NRS 51.345 as a statement against penal interests.[2] The basis for the State's objection was that Sparks' statements were not sufficiently corroborated, and the district court sustained the objection.

The determination whether corroborating circumstances clearly indicate the trustworthiness of a third party confession lies within the sound discretion of the trial court, which

---

corroborated in any way. In fact, all of the circumstantial evidence indicate the gun was not displayed. Why is the gun back upon the closet shelf? Why is—are there no fingerprints of her's on the gun? Why is there no blood found on the gun. . . .

[2]NRS 51.345 provides in relevant part:

1. A statement which at the time of its making:
(a) Was so far contrary to the declarant's pecuniary or proprietary interest;
(b) So far tended to subject him to civil or criminal liability;
. . . or
(d) So far tended to make him an object of hatred, ridicule or social disapproval, that a reasonable man in his position would not have made the statement unless he believed it to be true is not inadmissible under the hearsay rule if the declarant is unavailable as a witness. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

(Emphasis added.)

> is aptly situated to weigh the reliability of the circumstances surrounding the declaration, and this Court will review the exclusion of the . . . confession only for an abuse of discretion.

United States v. Guillette, 547 F.2d 743, 754 (2nd Cir. 1976). *See generally* Woods v. State, 101 Nev. 128, 696 P.2d 464 (1985).

Undoubtedly, Ralph Sparks' admission would have lent credibility to appellant's testimony of long-term sexual abuse and the attempted sexual assault which allegedly precipitated appellant's acts of self-defense. Character evidence is admissible for such purpose. NRS 48.045(1)(b); Coombs v. State, 91 Nev. 489, 538 P.2d 162 (1975).

We find that this admission was corroborated not only by appellant but also by John Sarb, a recognized expert in the field of child sexual and physical abuse who found numerous symptoms of abuse in appellant. Thus, we hold that the district court abused its discretion by excluding such relevant testimony.

### Expert Testimony

Appellant was the subject of two separate polygraph examinations. During the course of pretrial motions, the district court ordered that neither party refer to the polygraphs during trial, and the court directed counsel to so admonish their witnesses.

Dr. O'Gorman, a psychiatrist who examined appellant, would have given his opinion of appellant's sanity at the time of the homicide; however, when asked a foundational question relating to material which accompanied the request to examine appellant, Dr. O'Gorman stated that a polygraph report was present.

In an effort to curtail whatever effect the innocent mention of the word "polygraph" may have had upon the jury, the district court went so far as to restrict Dr. O'Gorman's testimony to responding to posed hypotheticals. The district court apparently concluded that instructing the jury to disregard and place no weight upon Dr. O'Gorman's mention of a polygraph report would have been insufficient to cure any inferences which the jury may have drawn. We note that Dr. O'Gorman did not mention the subject of the polygraph, what questions were asked by the polygraph examiner, or the results of the polygraph. Furthermore, he did not state that the polygraph had been a factor in the formation of his opinion. Thus, it appears unlikely that the jury would have drawn any inference whatsoever from the simple mention of the word "polygraph."

In Ake v. Oklahoma, 470 U.S. 68, 80 (1985), the Supreme Court recognized that the "assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." The Court concluded, therefore, that where it is likely that the defendant's sanity will be a significant factor in his defense, the State must afford the defendant the assistance of a psychiatrist in the preparation of his defense. 470 U.S. at 83.

Appellant, in fact, had the assistance of Dr. O'Gorman in the preparation of her defense, specifically the defense of temporary insanity; however, Dr. O'Gorman's testimony was severely restricted. Appellant was forced to pose 45 hypothetical facts as a foundation for her expert's opinion. The laborsome direct examination of Dr. O'Gorman and the State's dissection of the hypothetical, foundational facts obviously deflated Dr. O'Gorman's opinion.

While the "admissibility of expert testimony is a matter for the sound discretion of the trial judge," Townsend v. State, 103 Nev. 113, 119, 734 P.2d 705, 709 (1987), we have held that a reference to polygraphs is not necessarily reversible error, Aguilar v. State, 98 Nev. 18, 639 P.2d 533 (1982). Dr. O'Gorman's qualification to testify as an expert has not been questioned, yet he was restricted in his ability to express his opinion relating to appellant's mental condition, being restricted to an opinion based on hypothetical facts relating to a hypothetical individual. We hold that the district court abused its discretion in so restricting the examination of appellant's expert.

### *Plea Bargain Agreements*

Prior to trial, a plea agreement was entered into between the State and appellant in which appellant agreed to plead guilty to voluntary manslaughter. This agreement was rejected by the court without reason. Appellant then petitioned for a writ of mandamus. In response, the district court stated that the plea agreement had not been formally presented. In denying that petition, we stated:

> If the district court concludes there is a plea agreement between the parties, it shall conduct a plea hearing to decide whether to accept the plea, in order to comply with its obligation to consider seriously the proffered plea. *See* Sturrock v. State, 95 Nev. 938, 604 P.2d 341 (1979). If the district court disapproves the proposed agreement, it shall state the reasons for its disapproval on the record. *See, e.g.*, United States v. Ammidown, 497 F.2d 615 (D.C.Cir. 1973); Hanley v. State, 97 Nev. 130, 624 P.2d 1387 (1981).

Thereafter, the State withdrew its offer, but during trial the State again offered to negotiate. The trial judge, however, again refused to accept the agreement. At sentencing the district court stated its reasons for rejecting the agreement:

> In fact, very early on, the State apparently bought that concept [that appellant did not know right from wrong, and had an uncontrollable urge]. They were ready to plead you guilty to manslaughter, and even offered that in the middle of the trial. The Court stated, no, that was an issue for the jury to decide and not for them.

In *Ammidown,* after acknowledging that the trial court's acceptance of a plea agreement is discretionary, *see also* NRS 174.035(1); Hanley v. State, 97 Nev. 130, 624 P.2d 1387 (1981); Sturrock v. State, 95 Nev. 938, 604 P.2d 341 (1979), the court stated that the trial judge in rejecting an agreed plea "must provide a reasoned exercise of discretion," *Ammidown,* 497 F.2d at 622.

> The authority has been granted to the judge to assure protection of the public interest, and this in turn involves one or more of the following components: (a) fairness to the defense, such as protection against harassment; (b) *fairness to the prosecution interest, as in avoiding a disposition that does not serve due and legitimate prosecutorial interests;* (c) protection of the sentencing authority reserved to the judge. The judge's statement or opinion must identify the particular interest that leads him to require an unwilling defendant and prosecution to go to trial.
>
> . . . .
>
> The judge may withhold approval if he finds that the prosecutor has failed to give consideration to factors that must be given consideration in the public interest, factors such as the deterrent aspects of the criminal law. However, trial judges are not free to withhold approval of guilty pleas on this basis merely because their conception of the public interest differs from that of the prosecuting attorney. The question is not what the judge would do if he were the prosecuting attorney, but whether he can say that the action of the prosecuting attorney is such a departure from sound prosecutorial principle as to mark it an abuse of prosecutorial discretion.

*Ammidown,* 497 F.2d 622. (Emphasis added.)

The reasons given by the trial judge in this case reflect nothing other than the judge's opinion of the public interest. Moreover, we find that the trial court's reasoning—that the *jury* must determine which offense, if any, the defendant is guilty of—is insuffi-

cient to support the district court's rejection of the agreement. Therefore, we hold that the trial judge abused his discretion.

### Conclusion

We have carefully considered the assignments of error raised by appellant, and we conclude that the State's mishandling of evidence and the errors of the district court require that the judgment of conviction be reversed. Additionally, we vacate the $450 fine imposed upon defense counsel as a sanction for Dr. O'Gorman's inadvertent mention of the word "polygraph."