HARRY ANDREW SANBORN, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 17553

HARRY A. SANBORN, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 19755

June 6, 1991 812 P.2d 1279

*Schieck & Derke,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, *Bill Berrett,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, STEFFEN, J.:

Appellant, Harry A. Sanborn, was convicted by a jury of first degree murder with use of a deadly weapon and sentenced to two consecutive terms of life without the possibility of parole. Thereafter Sanborn filed a petition for post-conviction relief and a motion for a new trial. Both were denied. In these consolidated appeals, Sanborn challenges his conviction and the denial of his post-trial petitions for relief. Our review of the record reveals prejudicial error requiring a new trial. We therefore reverse and remand.

### Facts

On the evening of May 30, 1984, officers of the Las Vegas Metropolitan Police Department were summoned to Sanborn's residence following reports of a shooting. Upon their arrival, officers found Sanborn's wife in the living room with her husband, who was bleeding profusely from two bullet wounds. The officers asked Sanborn what happened. In response, he repeatedly stated that he had shot John Papili, a former business partner. Officers were forced to restrain the agitated Sanborn in order to prevent an aggravation of his injuries. Sanborn resisted the officers, rambling on about how he wanted to die. In answer to additional questions from the officers, Sanborn stated that he had shot himself, a declaration that he later described as a sarcastic remark. The victim, John Papili, was discovered in the next room, lying face down in a small amount of blood. His lifeless body revealed nine bullet wounds.

One of the officers picked up a small handgun found on the carpet inside the residence. Despite noticing blood on the gun and the area of the carpet from which it was retrieved, the officer placed the weapon in his right rear pocket without taking any precautionary measures to preserve its extrinsic evidentiary properties. Later, he placed the gun inside the trunk of his patrol car.

Although it was subsequently determined that the handgun was the weapon used to shoot Sanborn, an identification specialist was unable to recover latent fingerprints from the weapon and did not recall seeing any blood on it. Another handgun, determined to be the weapon used in shooting Papili, was also obtained at the scene.

The state's theory at trial was that Sanborn intentionally killed Papili and then turned a gun on himself. Although his attorney put forward no defense at trial, Sanborn claims that Papili was the initial aggressor and that he killed Papili in self-defense.

At trial, the state called numerous witnesses, including the officers and medical personnel who reported to the scene, and ballistics and identifications specialists. One ballistics specialist testified, over objection, that in his opinion a press contact firing (i.e., one inflicted by pressing a gun directly against the skin or clothing) would not leave a residue but would pass through the clothing into the flesh. He further testified that Sanborn's t-shirt, which was in poor condition, had no residue on it. However, pursuant to court order, the specialist had performed only one test on the weapon; the test did not involve a press contact firing. The specialist conducted a cylinder gap test to determine whether residue escaping from the revolver's cylinder gap would have left detectable amounts of residue on Sanborn's t-shirt, but did not perform a muzzle blast test to determine whether a press contact gunshot would have projected detectable amounts of residue onto the shirt. In addition, Sanborn's surgeon testified that he did not remember noticing gunshot residue in Sanborn's chest cavity. The jury also heard from a Sanborn friend and former employee who testified that Sanborn had confessed to her that he had killed Papili and shot himself.

At the conclusion of the state's case, Sanborn moved to dismiss counsel and represent himself, claiming that he had just learned that his attorney planned to put forward no defense. The court denied his motion as untimely and inappropriate. Thereafter, the defense rested without making an opening statement, calling any witnesses, or presenting any evidence.

Sanborn then insisted on testifying in his own defense. He testified that he and Papili had both a personal and business relationship for some years that was marred by a falling out a few years prior to the shooting incident. Sanborn stated that on the day of the killing, Papili had come to his house and asked him to help with a computer scam against Papili's employer. During an ensuing argument, Papili assertedly made a derogatory comment about Sanborn's daughter. Sanborn responded by physically ejecting Papili from the house. Sanborn also testified that Papili had previously threatened to get a gun and blow him away if he

ever laid a hand on him. Fearful, Sanborn got out his gun and sent his wife away. According to Sanborn, Papili returned and walked into the house carrying a gun. From that point, Sanborn's only recollection of the incident was that "everything just flashed." Upon regaining consciousness, he remembered seeing people milling around.

With the exception of Sanborn's testimony, no defense was presented to the jury. The jury returned a verdict of guilty of first degree murder with the use of a deadly weapon. Sanborn was sentenced to life without the possibility of parole for the murder and a consecutive identical term for the deadly weapon enhancement. Sanborn filed both a direct appeal and a petition for post-conviction relief based upon, *inter alia,* ineffective assistance of trial counsel. He also filed a motion for a new trial based upon newly discovered evidence consisting primarily of the results of test firing the gun used to inflict his own injuries. The post-trial testing was performed to determine whether a press contact gunshot would deposit residue on a cotton t-shirt (a "muzzle blast" test). Contrary to the trial opinion of the state's ballistics expert, the results produced by the test firing reportedly demonstrated that a press contact gunshot deposits a substantial amount of residue on clothing.

Following an evidentiary hearing, the district court denied both the petition for post-conviction relief and the motion for a new trial. A motion for rehearing of the petition for post-conviction relief was denied. Sanborn then appealed from the denial of his petition and motion. His appeals have been consolidated for consideration by this court.

## Discussion

Sanborn first contends that the district court committed reversible error by denying his petition for post-conviction relief based upon ineffective assistance of trial counsel. Sanborn primarily emphasizes his counsel's failure to conduct adequate pre-trial investigation and to present trial evidence concerning the victim's background and Sanborn's theory of self-defense as evidenced by facts demonstrating that his wounds were not self-inflicted. Sanborn asserts that as a result of these and other failures, trial counsel was ineffective. We agree.

To state a claim of ineffective assistance of counsel that is sufficient to invalidate a judgment of conviction, Sanborn must demonstrate that trial counsel's performance fell below an objective standard of reasonableness, and that counsel's deficiencies were so severe that they rendered the jury's verdict unreliable.

*See* Strickland v. Washington, 466 U.S. 668 (1984); Warden v. Lyons, 100 Nev. 430, 683 P.2d 504 (1984), *cert. denied*, 471 U.S. 1004 (1985).

Focusing on counsel's performance as a whole, and with due regard for the strong presumption of effective assistance accorded counsel by this court and *Strickland*, we hold that Sanborn's representation indeed fell below an objective standard of reasonableness. Trial counsel did not adequately perform pretrial investigation, failed to pursue evidence supportive of a claim of self-defense, and failed to explore allegations of the victim's propensity towards violence. Thus, he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Moreover, we are compelled to conclude that counsel's failures were so severe that they rendered the jury's verdict unreliable. Had the jury been properly presented with the evidence apparently available to support Sanborn's claim of self-defense, the outcome may very well have been different. Thus, counsel's efforts both before and during trial were sufficiently deficient "to deprive the defendant of a fair trial." *Id.* Accordingly, as discussed in greater detail below, Sanborn has stated a claim of ineffective assistance of counsel that warrants reversal of his conviction.

First, Sanborn contends that because of counsel's inadequate pretrial investigation and failure to present trial evidence regarding Papili's violent tendencies, Sanborn's own testimony was strongly devalued by the absence of corroborative evidence that would have been presented by diligent and effective counsel. In support of his position, Sanborn insists that, before trial, he had provided his attorney with a list of potential witnesses who were prepared to testify concerning Papili's aggressive behavior, his custom of carrying a gun, and his willingness to threaten its use. Sanborn further avers that these witnesses were in the courtroom, prepared to testify; and that he was led to believe that his theory of self-defense would be pursued by his counsel.

We reject the state's claim that counsel's failure to present a defense was sound trial strategy. There was sufficient evidence to present a self-defense claim.[1] In pursuing such a claim, evidence of the victim's general character would have been admissible.

---

[1]Specifically, we note that Sanborn testified that Papili entered his home with a gun in hand. Additionally, had counsel pursued it, there was evidence available to corroborate Sanborn's claim that his own wounds were not self-inflicted, as shown by the subsequent test results. Further, there may have been evidence tending to support the proposition that Papili was the aggressor.

NRS 48.045(1)(b). Moreover, evidence of acts of violence by the victim, known by Sanborn prior to the homicide, would have been admissible to show Sanborn's state of mind on the issue of self-defense. Burgeon v. State, 102 Nev. 43, 714 P.2d 576 (1986).

Second, Sanborn claims that evidence and testimony were available which would have demonstrably refuted the state's contention that his wounds were self-inflicted. He also contends that if such proofs had been presented, the remaining inference would have been that his wounds were inflicted by Papili, thus supporting his claim that he acted in self-defense. Specifically, Sanborn relies on the post-trial muzzle blast test which showed that a self-inflicted, hard press contact wound leaves massive residue on clothing. He persuasively argues that counsel's failure to develop this evidence resulted in the jury hearing only the state's erroneous conclusion that a press contact firing leaves no residue. Particularly because the undeveloped evidence belatedly produced from an actual test firing would have directly contradicted the state's untested opinion evidence, Sanborn was denied the effective assistance of counsel on this critical aspect of his defense. Sanborn's defense was clearly prejudiced by his counsel's failure to develop and present evidence which would have corroborated Sanborn's testimony and discredited the state's expert witness. Because of counsel's lack of due diligence, Sanborn was deprived of the opportunity to present testimony material to his defense, and we are therefore unable to place confidence in the reliability of the verdict. *See* Strickland v. Washington, 466 U.S. 668, 687 (1984).[2]

The instant case is analogous to Warner v. State, 102 Nev. 635, 729 P.2d 1359 (1986), in which we held that failure to use the public defender's full-time investigator, to investigate the background of the victim, to present evidence in support of the appellant's character, and to contact witnesses, employers, and co-workers constituted inadequate pretrial investigation resulting in the ineffective assistance of counsel. In Sanborn's case, although defense counsel used an investigator to some degree, he admitted that the information contained in the witnesses' affidavits was more useful than the investigator had led him to believe. Many other potential witnesses were never contacted, even though several of them apparently would have testified that Papili was violent and threatening and carried a gun. Moreover, defense

---

[2]The state's conclusion was based upon evidence consisting of a cylinder gap test and a ballistics specialist's opinion that, although he did not perform such a test, a press contact firing would not leave residue.

counsel admitted at the evidentiary hearing that testimony by corroborative witnesses would have been important. Furthermore, additional testing, even if inconclusive, would have supplied a basis for doubting the state's claim that Sanborn's wounds were self-inflicted.

Sanborn next contends that the district court erred in denying his motion for a new trial based upon newly discovered evidence. He asserts that the new evidence supports his theory of self-defense because it demonstrates, in rebuttal to the state's contrary claim, that he could not have inflicted his own wounds. He maintains that he made diligent efforts to discover this evidence for trial but that his efforts were stymied by his attorney.[3]

A district court may grant a new trial on the ground of newly discovered evidence. NRS 176.515(1). The grant or denial of a new trial on this ground is within the trial court's discretion and will not be reversed on appeal absent its abuse. McCabe v. State, 98 Nev. 604, 655 P.2d 536 (1982). To establish a basis for a new trial on this ground, the evidence must be: newly discovered; material to the defense; such that even with the exercise of reasonable diligence it could not have been discovered and produced for trial; non-cumulative; such as to render a different result probable upon retrial; not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable;[4] and the best evidence the case admits. McLemore v. State, 94 Nev. 237, 577 P.2d 871 (1978).

Although we have determined the need to clarify our case law concerning the criteria for determining a criminal defendant's right to a new trial, we decline to determine whether the criteria

---

[3]At calendar call, Sanborn informed the court that the defense was not ready in part because necessary firearm tests had not been performed. In addition, during the pretrial evidentiary hearing, Sanborn addressed the court and reiterated the need to have the proper tests performed. Finally, during an offer of proof outside the presence of the jury, Sanborn pointed out that the court's original order did not include the test that ultimately produced the newly discovered exculpatory evidence (the muzzle blast test).

[4]In McLemore v. State, 94 Nev. 237, 239-40, 577 P.2d 871, 872 (1978), we perpetuated earlier rulings by this court which disallowed as a basis for new trial consideration newly discovered impeachment evidence unless the witness to be impeached was so important that a "different result *must* follow." (Emphasis added.) In view of the near impossibility of ever satisfying the "must" burden, and in further recognition of the fact that new trial criteria addresses the all-important issue of innocence or guilt, we have modified the impeachment standard to one that would render a different result "reasonably probable."

has been satisfied by Sanborn. Having already concluded that Sanborn's conviction must be reversed because of the ineffective assistance of trial counsel, it is unnecessary for us to determine that issue.

Sanborn next contends that the district court committed reversible error by denying his motion to dismiss counsel and represent himself. He asserts that the motion was neither untimely nor inappropriate because: (1) he made the motion as soon as he discovered that his attorney intended to present no defense on his behalf; (2) he had on previous occasions requested additional counsel and more time; (3) he had witnesses in the courtroom who were prepared to testify; and (4) the denial of his motion deprived him of his rights to self-representation and due process.

Although a defendant's right to self-representation is sharply curtailed once trial has begun,[5] if "the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress," then such right must be respected. Schnepp v. State, 92 Nev. 557, 560, 554 P.2d 1122, 1124 (1976). In this case, because his attorney planned to put forward no defense whatsoever, the denial of Sanborn's legitimate interest in self-representation was so prejudicial that it outweighed considerations pertaining to disruption of the proceedings. Thus, we conclude that Sanborn was denied his sixth amendment right to self-representation. Faretta v. California, 422 U.S. 806 (1975). We further conclude that denial of the motion deprived Sanborn of his right to due process because he was denied the right to present testimonial evidence concerning the violent propensities of the victim. *See* Coombs v. State, 91 Nev. 489, 538 P.2d 162 (1975). We therefore hold that, under the circumstances of this case, the district court committed reversible error by denying Sanborn's motion to dismiss counsel and represent himself.

Sanborn next contends that reversal is mandated because the state failed properly to collect and preserve the firearm which was used to inflict his wounds. He asserts that the state's mishandling of the gun prejudiced him because analysis of fingerprints and blood from the gun was crucial to his theory that he acted in self-defense.

In Sparks v. State, 104 Nev. 316, 759 P.2d 180 (1988), we held that a conviction may be reversed when the state loses evidence if the defendant is prejudiced by the loss. In this case, although the

---

[5]Lyons v. State, 106 Nev. 438, 796 P.2d 210 (1990).

chain of custody of the gun itself was not broken, the improper handling of the gun resulted in a loss of evidence similar to *Sparks*. Mishandling of the gun resulted in a loss of evidence of blood and fingerprints; the cases are therefore analogous. As in *Sparks*, there were no witnesses, other than the accused, to a homicide claimed to have been committed in self-defense, and Sanborn's self-defense claim rested almost exclusively on his own testimony at trial. If Sanborn's testimony is true, evidence of blood or fingerprints on the weapon could have been critical, corroborative evidence of self-defense. The state's case was buttressed by the absence of this evidence. Therefore, the state "cannot be allowed to benefit in such a manner from its failure to preserve evidence." *Id.* at 319, 759 P.2d at 182. We hold that Sanborn was indeed prejudiced by the police officer's mishandling of the gun. However, unlike the instant case, in *Sparks* there was substantial corroborative evidence of the defendant having been subjected to violent abuse by the victim over a period of many years. Indeed, the police officer who interrogated Cody Sparks saw corroborative evidence of fingernail file stabbings, burns, and bruises. As a result, in *Sparks* we were compelled to view the mishandling and loss of potentially exculpatory evidence by the state as sufficiently prejudicial to warrant both a reversal and the dismissal of all charges. We need not do so here.

In the event the state elects to prosecute Sanborn anew, the trial court shall instruct the jury that because the state failed to test the firearm that was used to inflict wounds on Sanborn for blood and fingerprints, the weapon is irrebuttably presumed to have been held and fired by the victim, Papili. Of course, it would be left to the jury to determine, in weighing all of the evidence, whether Sanborn was shot by the victim in an act of self-defense. We are acutely aware of the hardship this ruling will impose on the state in any subsequent prosecution of Sanborn, but conclude that the only alternative to this disposition would be to order the charges dismissed. We are simply unable to conclude from this record that any other ruling by this court would provide Sanborn with the prospect of a fair trial.

Sanborn next contends that the prosecutor's conduct during closing argument was improper and prejudicial. We note, however, that this issue was not preserved for appellate review because of the failure of defense counsel to object. We nevertheless observe that the prosecutor's remarks concerning his personal beliefs, placing the jury in the victim's shoes, and commenting without an evidentiary foundation on the absence of defensive wounds on the persons of both Sanborn and the victim

did constitute improper conduct which we trust will not be repeated in the event of a retrial.

We have considered Sanborn's remaining contentions and conclude that they lack merit. Accordingly, for the reasons previously discussed, we reverse Sanborn's judgment of conviction and remand for a new trial should the state elect to prosecute Sanborn under the constraints established by this opinion.

MOWBRAY, C. J., ROSE and YOUNG, JJ., concur.

SPRINGER, J., concurring in part, and dissenting in part:

While I agree with the majority's decision to reverse Sanborn's conviction, I do not agree that the case should be remanded for a new trial. In my view, the instant case is controlled by Sparks v. State, 104 Nev. 316, 319, 759 P.2d 180, 182 (1988). In *Sparks,* we held that where the State had mishandled evidence (a gun) that was crucial to the defense, the defendant could not be retried. Today, on an almost identical set of facts, we hold that the State *may* retry Sanborn. As I stated in Haberstroh v. State, 105 Nev. 739, 743, 782 P.2d 1343, 1345 (1989) (SPRINGER, J., concurring), "[W]hat we disapprove of yesterday, we approve of today." Because I believe that *Sparks* should be followed and that we should overrule cases explicitly, or not at all, I dissent.