*1160 OPINION
By the Court,
Rose, J.:
In 1977, respondent/cross-appellant Frank LaPena was convicted of first degree murder and robbery with the use of a deadly *1161 weapon. This court reversed the conviction and remanded for a new trial. In 1989, LaPena was again convicted of first degree murder and robbery, and sentenced to life imprisonment without the possibility of parole. This court affirmed the conviction. In 1992, LaPena filed a petition for post-conviction relief (the “PCR petition”), which the district court denied; this court remanded the case for an evidentiary hearing. In December 1993, LaPena filed a motion to dismiss all of the charges against him. In 1995, the district court conducted an evidentiary hearing and, based on the evidence adduced therein, granted LaPena’s PCR petition on the ground that LaPena had been denied effective assistance of trial counsel. The district court denied LaPena’s motion to dismiss and ordered a new trial.
The State appeals from the district court’s grant of post-conviction relief vacating LaPena’s conviction and sentence. LaPena cross-appeals from the district court’s denial of his motion to dismiss all charges against him. We conclude that the district court erred in granting LaPena’s PCR petition. Consequently we reverse the district court’s order and dismiss LaPena’s cross-appeal.

FACTS

At approximately 5:00 a.m. on January 14, 1974, the elderly couple of Hilda and Marvin Krause were robbed at their Las Vegas home located inside a walled country club community. During the course of the robbery, the perpetrators beat Mr. Krause and murdered Mrs. Krause. When police arrived at the Krause home, they found the deceased Mrs. Krause gagged with a scarf tied loosely around her neck, and a butcher knife imbedded in her back; her throat had been slit. An autopsy revealed that Mrs. Krause had been strangled with a cord or rope prior to having her throat slit and that she had sustained several stab wounds to her neck after her throat had been slit.
Mr. Krause told police that he had been attacked by two Caucasian men after he opened his garage door and as he was getting into his car to go to work. The men forced him into the house where they beat him and tied him up, murdered Mrs. Krause, and stole a television, gold coins, and jewelry, including a diamond ring and a watch. Mr. Krause reported that after the assailants left his home, he untied himself and went upstairs in an attempt to aid Mrs. Krause. Physical evidence indicated that at least two perpetrators had been present at the Krause home. The perpetrators left the scene in Mr. Krause’s car but abandoned it at the gates of the country club. Mr. Krause suffered a head injury in the attack; he died the following year from unrelated causes.
Several days after the crime had been committed, a confidential informant (later identified as Joey Costanza) contacted Las *1162 Vegas Metropolitan Police Department (LVMPD) Detective Mike Whitney. Costanza told Det. Whitney that approximately six weeks before the Krause robbery/murder, Gerald Weakland had approached him about assisting in a robbery/murder to take place in the early morning hours of a Monday or Friday before one of the victims went to work and would involve scaling a wall of some sort. Costanza allegedly knew the exact location of the crime scene (i.e., the Krauses’ address). Costanza also mentioned two other individuals who might have been solicited or involved in the crime — Tom Boutwell and Bobby Webb.
Det. Whitney gave this information to several police officers, including Lieutenant Beecher Avants and Detective Chuck Lee, who subsequently questioned Boutwell, Webb, and Weakland. In a February 1974 telephone conversation between Lt. Avants and Costanza, Costanza allegedly stated that he had never heard the names of LaPena or Rosalie Maxwell, LaPena’s girlfriend, associated with Weakland or the Krause crimes. Police arrested Weakland for the Krause murder/robbery in March 1974.
During a preliminary hearing, Weakland admitted to the crimes and struck a deal with the State wherein he agreed to testify that Maxwell and LaPena had hired him to murder Mrs. Krause. In exchange for this testimony, Weakland was allowed to plead guilty to second degree murder, with a sentence of five years to life, and all other charges against him (some of which were unrelated to the Krause crimes) were dropped. In his March 29, 1974 confession, Weakland told authorities that while Boutwell, his accomplice, was robbing the Krause home, he slipped upstairs and murdered Mrs. Krause by slitting her throat with a single cut. Weakland maintained that he had not strangled Mrs. Krause or stabbed her in the neck. Weakland maintained that LaPena, an acquaintance to whom he owed money, had approached him at the end of December 1973, and asked him to kill Mrs. Krause. LaPena allegedly explained to Weakland that Mr. Krause was a wealthy slot manager at Caesar’s Palace who was dating LaPena’s girlfriend, Maxwell, who also worked at Caesar’s. LaPena and Maxwell wanted Weakland to kill Mrs. Krause so that Maxwell could marry Mr. Krause and inherit the Krause fortune for the benefit of herself and her boyfriend, LaPena.
Weakland claimed that LaPena had offered to forgive his debts and pay him a large sum of money in exchange for Mrs. Krause’s murder. On January 4, 1974, Weakland went to Maxwell’s apartment where she and LaPena gave him $1000 as a down payment for the murder, told him that he would receive another $10,000 after Maxwell married Mr. Krause, and explained the “plan” for robbing the Krauses and murdering Mrs. Krause. Maxwell allegedly gave Weakland a map of the Krauses’ residence during *1163 this meeting. Weakland stated that he asked Webb to help him commit the crime but, ultimately, Boutwell accompanied him. Weakland told police that he had never spoken to or had any contact with Mr. Krause prior to the January 1974 robbery/murder.
Based upon Weakland’s statements to the police, on April 23, 1974, LaPena and Maxwell were arrested for the Krause robbery/murder. Both were charged with first degree murder and robbery with the use of a deadly weapon. The criminal complaint alleged that LaPena and Maxwell had entered into a contract with Gerald Weakland “whereby . . . Weakland was to kill [Mrs. Krause].”
Weakland testified to LaPena’s guilt at LaPena’s preliminary hearing; however, at both Maxwell’s and LaPena’s separate trials, Weakland testified that his prior testimony and statements implicating LaPena and Maxwell in the murder were false. LaPena v. State, 98 Nev. 135, 136, 643 P.2d 244, 244 (1982). Maxwell was acquitted at trial, but LaPena was convicted by a jury of one count of first degree murder and one count of robbery with the use of a deadly weapon.
On direct appeal, this court reversed LaPena’s conviction and remanded for a new trial on the ground that admission of Weakland’s statements incriminating LaPena constituted reversible error. This court concluded that the State had improperly withheld “the benefits of a plea bargain or promise of leniency until after a purported accomplice [(i.e., Weakland)] had testified in a particular manner.” Id. at 136-37, 643 P.2d at 244-45. Weakland was eventually charged with two counts of perjury, to which he entered an Alford plea and received probation. Gary Gowen, Esq., assumed LaPena’s representation.
On September 29, 1982, Weakland testified against LaPena before a grand jury, reiterating his initial statements to police and testimony at LaPena’s preliminary hearing implicating LaPena and Maxwell. Weakland told the grand jury that he had since reached a new agreement with the State wherein “the prosecution team would cease writing negative letters to the State parole board” about Weakland. The grand jury returned an indictment against LaPena.
In anticipation of retrial, LaPena filed a motion for disclosure of the identity of confidential informant Costanza. After the district court denied his motion, LaPena filed a petition for a writ of mandamus, which this court granted. LaPena v. District Court, Docket No. 14640 (Order Granting Petition for Writ of Mandamus, August 31, 1983).
After this court ordered Costanza’s name divulged, Det. Lee traveled to New Jersey to meet with Costanza and to encourage Costanza to return to Nevada. Costanza refused to travel to *1164 Nevada and called Lt. Avants after meeting with Det. Lee. Costanza told Lt. Avants that he had no additional information to provide with regard to the Krause robbery/murder. Upon receipt of Costanza’s name and New Jersey address, Gowen sent Costanza a letter; Costanza subsequently telephoned Gowen and told him that he had no additional information beyond that which he had already given to Det. Whitney shortly after the Krause robbery/murder.[1]
Gowen then tried to compel Costanza’s attendance through the use of the Interstate Compact and eventually enlisted the help of the LVMPD in filing a material witness warrant. According to Gowen, the district attorney’s office refused to help. Prosecutor Melvyn Harmon maintained that he advised Gowen as to how to compel Costanza’s attendance, but Gowen chose to take an ineffective “short cut.”
Costanza contacted the police as well as the district attorney on several occasions to impress upon them that he knew nothing more than the information he had previously provided in his police report. Nonetheless, in 1984 LaPena was still seeking Costanza’s attendance in Nevada and filed a motion to depose Costanza. This court reversed the district court’s denial of LaPena’s motion. LaPena v. Moran, Docket No. 16196 (Order, October 22, 1985).
On January 15, 1985, Costanza was arrested in Florida. Det. Lee and an individual from the Clark County district attorney’s office were dispatched to Florida in an attempt to secure Costanza’s testimony in Nevada.2 Defense investigator Michael Wysocki flew to Florida the following day. However, Costanza was released from custody at the conclusion of a Florida hearing to compel his attendance in Nevada “because proper documents had not been provided.”
LaPena subsequently filed a motion with the district court for an evidentiary hearing to determine if the State had complied with certain discovery requests including those seeking further information with regard to Costanza. The district court denied the motion, but this court issued an order that an evidentiary hearing be conducted concerning whether the State had disclosed all of its information regarding Costanza. LaPena v. District Court, Docket No. 18963 (Order Granting Petition for Writ of Mandamus, August 26, 1988).
The district court subsequently conducted an evidentiary hearing on October 26-27, 1988. At the beginning of this evidentiary *1165 hearing, Gowen learned that he had been relieved as LaPena’s counsel. George Carter, Esq., and Lamond Mills, Esq., were appointed to represent LaPena through his second trial. Following the evidentiary hearing, the district court concluded that the State had provided all of the information in its possession regarding Costanza and denied LaPena’s motion seeking further funds “for the Costanza matter.”
Although Gowen had been removed from LaPena’s case, he continued to work on the matter and helped Mills file a pre-trial motion to dismiss the indictment on behalf of LaPena. LaPena’s second jury trial commenced in May 1989, and he was again convicted of first degree murder and robbery with the use of a deadly weapon. LaPena did not testify on his own behalf. The trial court sentenced LaPena to life imprisonment without the possibility of parole for the murder of Mrs. Krause, and a concurrent thirty-year sentence for the robbery of the Krause home with the use of a deadly weapon. This court affirmed LaPena’s conviction and sentence. LaPena v. State, Docket No. 20436 (Order Dismissing Appeal, June 27, 1991). Gowen assisted LaPena’s appellate counsel, Carmine Colucci, and argued the case before this court.
On June 3, 1992, LaPena filed the PCR petition at issue. The district court denied LaPena’s PCR petition without conducting an evidentiary hearing. On appeal, this court remanded the matter for an evidentiary hearing. LaPena v. State, Docket No. 23839 (Order of Remand, November 24, 1993). On December 3, 1993, LaPena filed a motion to dismiss the indictment based upon an alleged lack of evidence and “a colorable claim of factual innocence.” LaPena’s motion to dismiss was subsequently consolidated with the PCR petition, and LaPena presented evidence in support of dismissal at the evidentiary hearing.
The district court conducted the evidentiary hearing October 16-20, 1995. The district court then granted LaPena’s PCR petition and vacated his conviction and sentence on the ground that LaPena had not received effective assistance of trial counsel. The district court denied LaPena’s motion to dismiss and ordered the matter reset for a new trial. The State appeals from the grant of LaPena’s PCR petition, and LaPena cross-appeals from'the denial of his motion to dismiss the indictment.

DISCUSSION

The district court erred in granting respondent’s petition for post-conviction relief on the basis of ineffective assistance of counsel

“The question of whether a defendant has received ineffective assistance of counsel at trial in violation of the Sixth Amendment *1166 is a mixed question of law and fact and is thus subject to independent review.” State v. Love, 109 Nev. 1136, 1138, 865 P.2d 322, 323 (1993). To establish ineffective assistance of counsel, a defendant must show that counsel’s representation fell below an objective standard of reasonableness and that counsel’s deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). To establish prejudice, the defendant must show that but for counsel’s mistakes, there is a reasonable probability that the result of the proceeding would have been different. Id. at 694. Judicial review of a lawyer’s representation is highly deferential, and a defendant must overcome the presumption that a challenged action might be considered sound strategy. Id. at 689.

Counsel were not ineffective in their impeachment of Weakland at LaPena’s second trial

Following the evidentiary hearing below, the district court found that: “On September 29, 1982 Weakland testified before the Clark County Grand Jury and again implicated LaPena, however, before he testified the State entered into a written agreement with Weakland not to interfere with his efforts to obtain parole.’ ’ The district court further found that Mills was aware that Weakland had negotiated with the State for his testimony against LaPena. The district court noted the importance of Weakland’s testimony and found that the failure to use this information to impeach Weakland at trial had greater impact than it would have had for a less important witness.
We do not contradict the finding that Weakland was not impeached at trial using the specific 1982 agreement wherein law enforcement agreed to stop “sabotaging Mr. Weakland’s efforts to get paroled” in exchange for Weakland’s testimony before the grand jury and at trial. Rather, we find that Weakland’s credibility was, nonetheless, substantially impeached at trial, such that LaPena’s counsel rendered “reasonably effective assistance” pursuant to Strickland.
Mills cross-examined Weakland at trial and elicited the fact that in 1974 Weakland had pleaded guilty to second degree murder for the Krause robbery/murder and other unrelated charges were dropped by the State in exchange for his testimony against LaPena. Weakland admitted that he had recanted his story implicating LaPena in the first trial, been convicted of perjury, and had now switched back to his original story against LaPena. Furthermore, at trial, counsel presented the testimony of psychol *1167 ogist William Mason Knapp, Ph.D., who had extensively evaluated Weakland and found him to be a psychopathic liar.[3]
LaPena argues that the defense counsel should have obtained expert advice concerning inconsistencies between Weakland’s testimony regarding the murder and the autopsy report. However, the discrepancies were obvious enough that, applying the highly deferential standard of Strickland, we cannot say counsel was deficient in this regard. Counsel extensively cross-examined Weakland on inconsistencies between Weakland’s testimony as to what he did to Mrs. Krause and the findings of the coroner.[4]
With regard to impeachment of Weakland based on events in his recent past, we conclude that counsel was by no means deficient. During the evidentiary hearing, Weakland testified that in 1985, while in prison for the murder of Mrs. Krause, he had hit a civilian. Following a trial, he was convicted of battery and sentenced to one year in prison. Habitual criminal charges were filed but, according to Weakland, the judge “flat refused to consider” those charges. Weakland was paroled in 1988.
Weakland also testified at the evidentiary hearing that following his 1988 release, there had been four attempts to revoke his parole. One 1990 incident involved driving with an open container; Weakland was incarcerated for thirty-five days and re-released on parole. Some time after 1988, Weakland entered a plea to being an ex-felon in possession of a firearm and received a one-year sentence from the court and a one-year violation from the parole board. Then, in 1994, Weakland was imprisoned pending trial for battery and robbery charges arising out of a fight at Baldini’s Casino; he was acquitted following a 1995 trial and immediately released. Finally, in the summer of 1995, Weakland’s parole was revoked based on alcohol consumption, and he was placed on house arrest for six months. Weakland also stated that at the time he testified against LaPena in 1989, he was drinking and gambling.[5]
At trial, counsel accused Weakland of murdering a fellow inmate and assaulting another individual. The trial court deemed this evidence inadmissible as Weakland had not been convicted of *1168 either crime and the crimes did not involve dishonesty. Additionally, counsel tried to introduce evidence that prior to Mrs. Krause’s murder, Weakland had worked for Costanza, who Weakland testified was a loan shark, as “the muscle” or a “body guard.” The trial court held that this line of questioning was also inadmissible.
At the 1989 trial, when asked about his changed story once again implicating LaPena, Weakland testified that since being released from prison in 1988, he had undergone what LaPena describes as “a moral transformation.”[6] LaPena contends that this testimony “opened the door” for his counsel who should have impeached Weakland with his behavior after release, including Weakland’s drinking and gambling. LaPena further asserts that although during cross-examination at the 1989 trial Mills brought out the fact that Weakland had recently been convicted of hitting a civilian, counsel failed to ask questions that would have shown the jury that Weakland received extremely lenient treatment in this and other matters as another benefit for his testimony against LaPena in the 1989 trial.
We conclude that even though certain evidence was held inadmissible, defense counsel made substantial efforts to impeach Weakland with bad acts, his prior perjury convictions, and numerous inconsistencies between Weakland’s testimony and the physical evidence. LaPena bears the burden of “showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment” and “that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.” Strickland, 466 U.S. at 687. We conclude that LaPena has failed to meet this burden. Applying an “objective standard of reasonableness,” we conclude that counsel were not deficient in their impeachment of Weakland.

LaPena’s failure to testify was not the result of ineffective counsel

The district court found that counsel failed to adequately prepare for trial and investigate possible corroborating witnesses and that these failures resulted in LaPena’s decision not to testify at his 1989 trial. The parties concede that LaPena was aware of his right to testify at his second trial and voluntarily waived that right. The parties also concede that LaPena’s testimony went poorly at his first trial. We conclude that LaPena made an informed, strategic choice not to testify in the second trial.
*1169 At the evidentiary hearing Mills and Carter consistently testified that LaPena decided not to testify so as to avoid the “expected rigorous and thorough cross-examination.” Mills explained that LaPena had been extremely involved in all decisions made regarding his defense, and further noted: “I should advise you though I have never had a client who wanted to testify who did not testify.’ ’ Mills testified that LaPena had stated that he did not want to be cross-examined by Harmon. Also, during the same general time frame as the Krause robbery/murder, LaPena was the defendant in another case wherein he had been accused of hiring Weakland and Webb to enforce a contract on an individual by the name of Obenauer. LaPena’s conviction in the Obenauer case was reversed, but he was still afraid that this incident might surface if he testified in the Krause case.
LaPena admits to these discussions with counsel, but maintains that the only reason he decided not to testify was because counsel would not call other witnesses to corroborate his proposed testimony. LaPena does not elaborate on what this testimony might be. The State points out that in the first trial, numerous prosecution witnesses contradicted LaPena’s testimony as to where and when he had first met Weakland, that LaPena was a respectable businessman, that Weakland had not been to Maxwell’s house to meet with Maxwell and LaPena shortly before the Krause robbery/murder, that Weakland had not given him gloves worn by Weakland during the murder, and that he had never met with Webb.
LaPena asserts that the witnesses who were called by counsel in his second trial failed to corroborate his potential testimony and in no “way presented a theory of defense.” However, several inmates testified for the defense as to statements made by Weakland while in jail, prior to LaPena’s first trial, which indicated that Weakland had falsely implicated LaPena in the Krause robbery/murder. Charles Cooper had testified that in 1974, fellow-inmate Weakland had told him that he had falsely implicated LaPena in the Krause robbery/murder to avoid the death penalty. Eddie Eckert was a prison friend of Weakland and testified that Weakland “hate[ed LaPena’s] guts” and had told Eckert that he had to think of someone to blame for the crime or Weakland’s wife would be blamed. Eckert also claimed that he had spoken with LaPena while they were both incarcerated and LaPena had denied being involved in the Krause robbery/murder. Another inmate, Bernard Ybarra, testified that Weakland had stated LaPena “didn’t know anything about” the Krause robbery/murder, and that Mr. Krause “did it.”
An acquaintance of the Krauses testified that she had never seen Mr. Krause’s alleged mistress, Maxwell, at the Krause home *1170 before the murder. Also, an LVMPD transport officer testified that he had never had any problems with LaPena, and a woman testified that Maxwell had been working on the night Weakland allegedly met with LaPena and Maxwell at Maxwell’s townhouse, prior to the Krause robbery/murder.
At the evidentiary hearing, LaPena testified that the following witnesses should have been called by counsel at his 1989 trial: (1) Melinda Swerigan to testify that on the day Weakland alleged he had come to the Hacienda Hotel to get a payoff from LaPena for the Krause crimes, Weakland was actually applying for a job; (2) Otis McClindon and Tills Bank, who had testified at LaPena’s 1974 preliminary hearing, to testify that certain monies paid by LaPena to Weakland’s ex-wife were a loan and not a payoff for Mrs. Krause’s murder; (3) Camille Dixon, Brian Clayton, Richard Grisham, and other neighbors to testify that LaPena did not have a meeting with Webb in November 1973; (4) Geneva Blue to testify that Maxwell had contracted for the murder of Mrs. Krause and that LaPena was completely innocent; (5) “Nurse Haley” to testify as to jewelry Mr. Krause was wearing when he was brought to the emergency room on the day of the robbery/murder; and (6) Maxwell to rebut the State’s theory of LaPena’s motive, to impeach Weakland, and to corroborate LaPena’s proposed testimony.
According to Gowen, Maxwell’s testimony would have shown that she always worked Fridays and thus could not have given Weakland the money to kill Mrs. Krause on a Friday night. However, this evidence would not be helpful given the fact that Weakland thought he received the money on January 2, 1974 — a Wednesday — which is corroborated by evidence of a January 3, 1974 deposit slip for Weakland’s account. Gowen also said Maxwell could contradict the fact that she took the money she gave to Weakland out of a Bible, because she would testify that she is agnostic. However, as the district court pointed out there is no evidence that Weakland ever made this statement regarding the Bible.
Moreover, Maxwell refused to testify in LaPena’s first trial, even after being held in contempt for trying to assert her Fifth Amendment rights after she had been acquitted. LaPena himself testified at the evidentiary hearing that when the State contacted Maxwell to give testimony in the 1989 trial she was reluctant. At the evidentiary hearing the district court judge asked her if LaPena was innocent, and she stated, “I don’t — no. Well — excuse me ... I don’t believe he’s guilty because I was arrested as a conspirator and I was not guilty so how could he be?” She further stated that she knew the time, location, and lawyers involved in LaPena’s 1989 trial, but she did not contact anyone to inform them of the alleged exculpatory value of her testimony.
*1171 Carter testified at the evidentiary hearing that certain witnesses “weren’t as important perhaps as Mr. LaPena might think they were.” Mills stated that they (he, Carter, and LaPena) agreed that Maxwell should not testify because in some areas “she was quite vulnerable and could in effect bring out information that we did not want to go before the jury.” Mills further testified:
I do not know of any witness in which [LaPena] wanted to call that we did not call. And I know with Rosalie Maxwell because I remember that particular meeting, that it was a joint agreement that we would not call her, that she had too much baggage.
I don’t recall of having any of those kind of conflicts over a witness. . . . [M]y philosophy is when it comes down to a situation that my client wants to call a witness I call the witness, unless I know the witness is going to submit perjury or something of that nature, the witness is going to be called.
We conclude that similar to LaPena’s decision not to testify, certain witnesses were not called based upon strategic reasoning which was made after reasonable investigation. Therefore, these decisions are “virtually unchallengeable.” Strickland, 466 U.S. at 690.[7]

LaPena has not shown prejudice by virtue of counsel’s failure to procure Costanza’s testimony

The district court found that LaPena’s counsel could have arranged for Costanza’s appearance and that the failure to have Costanza testify at trial was prejudicial to LaPena’s defense. The district court further found that the 1983 conversation Gowen reportedly had with Costanza provided impeachment information that could have been used against Weakland and went beyond the contents of the confidential informant reports that were admitted at trial.
*1172 We conclude that all the information provided by Costanza was presented at both of LaPena’s trials. Harmon, the lead prosecutor in both LaPena trials, testified at the evidentiary hearing that the primary reason for the seven-year delay between LaPena’s second indictment in 1982 and his second trial in 1989 was Gowen’s alleged inability to get Costanza to Nevada. Harmon stated that he had repeatedly told Gowen to use the Uniform Act to Compel the Attendance of Witnesses, codified in NRS Chapter 174, but Gowen failed to do so. The State asserts that Gowen deliberately ignored available means of gaining Costanza’s attendance as “a strategic delay tactic.” We agree.
Harmon further testified that Det. Whitney’s report detailing his initial contacts with Costanza in 1974 was presented at both trials, and Costanza repeatedly told the police that he had no other information than that which he had initially provided. Moreover, at the evidentiary hearing, Harmon testified that every trial judge connected with this case had been “most generous in relaxing the rules of hearsay so that, every scrap of material that was available regarding the confidential informant . . . could come before the trial jurors.’ ’
Assuming LaPena’s counsel was deficient in failing to procure Costanza’s testimony, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694. LaPena alleges that Costanza’s testimony would contradict Weakland’s and therefore is crucial to his defense; however, all of Costanza’s information was generously admitted at trial through reports and testimony of others involved. Furthermore, Costanza wrote a letter to Harmon and stated on several other occasions that he had told the police all that he knew years ago.
The fact that as of the 1995 evidentiary hearing LaPena had still not obtained an affidavit from Costanza specifying what additional exculpatory evidence he could provide undermines LaPena’s assertion that this testimony was critical to the 1989 trial’s outcome. We conclude that all evidence with regard to Costanza was properly presented in LaPena’s trials and, therefore, LaPena cannot show that Costanza’s presence would have likely produced a different result.

LaPena has not shown prejudice by counsel’s failure to obtain information in Gowen’s possession regarding Costanza

The district court found that Gowen’s intentional failure to document his 1983 conversation with Costanza and provide such information to successor counsel was prejudicial to LaPena’s *1173 defense, and successor counsel should have affirmatively pursued such information. The district court found that this combined failure of communication and effort was prejudicial to LaPena.
The parties agree that there was substantial communicatior between Gowen and successor counsel-Carter and Mills. Cartei testified at the evidentiary hearing that he "got pretty much everything" from Gowen prior to LaPena's 1989 trial. Likewise, Gowen testified that he had turned everything over-all his files, his opinion, his strategy, everything on the case-to Mills and Carter. Furthermore, Gowen remained involved in LaPena's casc through the second direct appeal.
According to LaPena, he did not discover that Gowen had received valuable information from Costanza until the 1995 evi-dentiary hearing. During the evidentiary hearing, Gowen stated that he had not given LaPena any details about his 1983 conversation with Costanza until after LaPena’s 1989 conviction. Gowen testified that there was information he never wrote down pertaining to LaPena’s case because he was paranoid about someone breaking into his office; however, he does not specify the nature of this information. Because LaPena has failed to present any evidence that the substance of Costanza’s 1983 conversation with Gowen would provide any additional information not previously presented to the jury, he has failed to show prejudice by any of counsel’s alleged deficiencies.

Counsel was not ineffective in failing to discover the alleged connection between Weakland and Mr. Krause

The district court found that proper investigation would have revealed a connection between Mr. Krause and Weakland and would have consequently impeached Weakland’s claim that he did not know Mr. Krause. The district court found that this fact was crucial to LaPena’s defense as it would have provided both motive and opportunity for Weakland to have committed the crime without LaPena.
At the 1995 evidentiary hearing, LaPena’s current counsel asked Weakland if he had ever met Mr. Krause prior to the 1974 robbery/murder; Weakland reiterated his contention from both trials that he had not. Ted Martinez then testified that he and Weakland had worked together as waiters at a Las Vegas restaurant. LaPena asserts that it was only through Martinez’ 1995 testimony that “LaPena was able to conclusively establish that Weakland had lied throughout the course of the various proceedings and was continuing in his lies about his involvement with Marvin Krause.’ ’
Martinez testified that the Krauses were regulars at the restaurant, but he could not say he knew of Weakland socializing with *1174 the Krauses or even that Weakland knew the Krauses personally. Moreover, Martinez did not remember more than two instances where Weakland waited on the Krauses during his three-year employment at the restaurant.
LaPena theorizes that Mr. Krause killed Mrs. Krause after Weakland left the Krause residence on the morning of January 14, 1974. LaPena relies on the fact that Weakland has consistently stated that he killed Mrs. Krause by slitting her throat; although the autopsy showed multiple stab wounds in Mrs. Krause’s neck and strangulation as the cause of death, Weakland maintains that he never stabbed or strangled her. Weakland testified that he did not check to see if Mrs. Krause was alive when he left the scene. LaPena asserts that all of this “exculpatory information” combined with Martinez’ testimony at the evidentiary hearing demonstrates his factual innocence and his trial counsel’s failure to properly investigate his case. We disagree.
Mills testified that efforts were made to uncover a connection between Weakland and Mr. Krause, and even if counsel had created a stronger connection between Weakland and Mr. Krause, there was overwhelming evidence that LaPena hired Weakland to commit the murder. Weakland never named anyone other than LaPena as the person who hired him to kill Mrs. Krause. Also, Webb testified at the 1989 trial that Weakland had told him that LaPena and Maxwell had hired him to kill Mrs. Krause. Weakland’s accomplice, Boutwell, also testified that LaPena had orchestrated the plan to kill Mrs. Krause. An inmate who had shared a cell with LaPena testified at the second trial that LaPena had admitted his involvement in Mrs. Krause’s murder. Det. Lee testified that shortly after the murder, LaPena accompanied Maxwell to the police station for questioning, and when officials interviewed LaPena he was quite upset and emotionally fell apart during the interview. One week later LaPena, still extremely nervous, contacted Det. Lee to tell him that the person who killed Mrs. Krause was an individual identified only as “Charlie the knife from Chicago.” Telephone records admitted into evidence revealed that one or two days after the murder, Weakland and his wife called LaPena’s residence from the Windsow Hotel in Lake Havasu, where they spent a day or two.
From the evidence presented at the evidentiary hearing, we conclude that LaPena has failed to show that counsel was deficient in pursuing the alleged Krause-Weakland connection; even if counsel was deficient, LaPena failed to show prejudice under Strickland. Having concluded that LaPena was properly convicted at his 1989 trial, we affirm the district court’s denial of LaPena’s motion to dismiss the charges against him.

*1175
CONCLUSION

Having reviewed all of LaPena’s assertions of ineffective counsel, we conclude that the district court erroneously granted LaPena’s PCR petition. The district court properly denied LaPena’s motion to dismiss all charges against him.[8]
Young and Shearing, JJ., and Zenoff, Sr. L, concur.

 Gowen would later maintain that unbeknownst to LaPena or LaPena’s successor counsel, Gowen received additional information from Costanza during this 1983 phone conversation.

 The fact that on cross-examination Dr. Knapp also gave an unfavorable opinion as to the credibility of two defense witnesses does not negate the impeachment value of Dr. Knapp’s testimony as to Weakland’s veracity.

 With regard to the fact that the autopsy report failed to mention the knife found in Mrs. Krause’s back, Mills stated that he did not see the need of retaining an expert to impeach the coroner on such an obvious discrepancy.

 Weakland’s wife also testified at the evidentiary hearing that Weakland had begun drinking and gambling excessively following his 1988 parole, contemplated suicide, and written bad checks.

 Weakland stated: “You know, I lost my values In life there a few years back. My family stuck through with me .... And they have constantly stuck by me. And I owe that to them, and 1 want to do what’s right.”

LaPena quotes Harris v. Reed, 894 F.2d 871, 878 (7th Cir. 1990) for the proposition that: “Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer.” We are not constructing defenses; rather, we conclude that LaPena has failed to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). We note that Sanborn v. State, 107 Nev. 399, 812 P.2d 1279 (1991), is entirely distinguishable from the instant case in that with the exception of Sanborn’s own testimony, counsel failed to present any defense whatsoever to the jury.

 The Honorable Charles E. Springer, Chief Justice, appointed The Honorable David Zenoff, Senior Justice, to sit in the place of The Honorable A. William Maupin, Justice. Nev. Const, art. 6, § 19; SCR 10.