STEVEN MICHAEL HOMICK, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 20447

January 27, 1992                                    825 P.2d 600

[Rehearing denied May 18, 1992]

*Schieck & Derke,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney; and *Melvyn T. Harmon,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Appellant Steven Michael Homick was convicted by a jury of

the first-degree murder of three unarmed victims with the use of a deadly weapon and sentenced to death. Homick was also convicted of robbery with the use of a deadly weapon, and burglary. On appeal, Homick raises several assignments of error, including emphatic claims of reversible error stemming from an alleged violation of the Fifth Amendment judicial nuance precluding the State from commenting on an exercise of the right to remain silent, and prosecutorial comment on the family of the victims. We conclude from our review of the trial record that Homick was fairly tried, convicted, and sentenced. We therefore affirm the judgment and sentence of death entered below.

## FACTS

In the early afternoon of December 11, 1985, David Tipton, unsuccessful in contacting his wife by telephone concerning their planned luncheon engagement for the day, drove unsuspectingly to a horror scene awaiting him at his Las Vegas home. After entering his residence and walking down the hall, he observed the body of a male sprawled across the floor at the entrance to the master bedroom. Mr. Tipton also noticed that the bedroom had been ransacked and that jewelry boxes were strewn about on the floor. Finally, the frantic man saw the bodies of his wife, Bobbie Jean Tipton, and the Tipton's housekeeper, Maria Bullock, on the floor of the walk-in closet containing a floor safe.

The trial evidence reflects that Homick had learned of the valuable jewelry owned by Mrs. Tipton as a result of his employment as a security specialist with The Tower of Jewels, a Las Vegas jewelry store where the victim had taken 50 to 60 pieces of her jewelry for appraisal and cleaning. Timothy Catt, a jeweler employed at The Tower of Jewels, testified that Homick told him that he had heard through his wife that Bobbie Jean Tipton was a very wealthy lady with magnificent jewelry, and that only a portion of it had been taken to The Tower of Jewels.

During the month following the murders, Homick twice showed Catt items of jewelry that Catt recognized as part of a collection belonging to Bobbie Jean Tipton. Homick did not indicate where he had obtained the jewelry, and warned both Catt and Catt's girlfriend, under threat, to keep quiet about the jewelry. Catt, who on occasion had worked on various pieces of the victim's jewelry, was familiar with many of the items because of their unique qualities. Finally, after inquiring of Catt as to the value of a pear-shaped diamond ring owned by Mrs. Tipton, Homick arranged to meet Catt at a commercial center. The meeting took place in Catt's automobile. After complaining of money problems, Homick eventually told Catt about the crimes he had committed in the Tipton residence.

Catt's testimony concerning Homick's admissions was consistent with the evidence found at the scene of the crimes. Homick stated to Catt that when Mrs. Tipton opened the floor safe, he shot her in the head. Homick also declared that he "also shot the nigger." As Homick continued the search for money inside the house, the doorbell rang. Homick answered the door, "yanked" the man inside and "offed him." The latter victim, James Meyers, was a deliveryman for a local steak and seafood business. Catt, fearful of Homick, did not reveal his knowledge of Homick's criminal conduct to the police until after Homick was taken into custody.

Autopsy examinations of the two female victims revealed that each had been shot in the head three times, evincing wounds consistent with those made by .22 caliber bullets. An autopsy on the body of James Meyers disclosed two bullet wounds to the head and one .38 caliber bullet wound to the anterior chest. The trial evidence revealed that Homick had possessed handguns consistent with those used in killing the three victims.

We deem it unnecessary to recite in detail the full extent of the evidence adduced at trial in support of the State's case against Homick. To characterize the evidence of his guilt as overwhelming is an evaluation fully supported by the record. The evidence of record vividly portrays the picture of what occurred in the Tipton residence on the morning of December 11, 1985. Homick's own daughter provided police with items of jewelry taken from the Tiptons and given to her by her father. Other witnesses presented testimony clearly identifying jewelry belonging to Mrs. Tipton in the possession of Homick. Indeed, a police surveillance in California produced evidence obtained by binocular viewing of Homick and others passing pieces of jewelry, and Homick placing the jewelry in plastic bags. A search of the surveilled premises pursuant to a search warrant, produced, among other items, a stone later identified as having been specially created for, and belonging to, Bobbie Jean Tipton.

Additional evidence of Homick's guilt included testimony by a long time friend and criminal confederate of Homick's, Michael Dominguez, who, at Homick's behest, attempted to murder a man by the name of Craig Maraldo to satisfy a drug debt owed to Homick. A firearms expert, Richard Good, testified that the eight .22 caliber Remington long rifle expended cartridge casings recovered from the Tipton house were fired from the same weapon as six of the seven expended casings found at Maraldo's residence. Moreover, Dominquez testified that on the afternoon of the day of the Tipton murders, he saw in Homick's car the same .22 Ruger with silencer that Homick had loaned to Dominguez to kill Maraldo.

In January of 1986, Ronald Byrl, another of Homick's associates, was arrested and his house examined pursuant to a warranted search. Among the items uncovered by the search were a diamond ring and two handguns, a .38 and a .22, both equipped with silencers. Byrl testified that Homick brought a number of pieces of jewelry to him in order to use his portable grinder to clean the items and remove identifying markings. Homick explained to Byrl that the jewelry came "from a good job." Also included among the items taken to Byrl were several rings, a lady's blue Piaget wristwatch, and a man's Rolex watch later identified as belonging to David and Bobbie Jean Tipton. Byrl testified that Homick had also asked him to store eight handguns.

As previously stated, it is unnecessary to recite fully the evidence of Homick's guilt. The qualitative and quantitative magnitude of the evidence against Homick leaves slight room for doubt concerning the verity of his guilt.[1]

## DISCUSSION

Homick strenuously contends that reversible error occurred in the penalty phase of his trial. We will therefore address that phase of trial first and thereafter discuss issues relating to assignments of error attributable to the guilt phase of trial.

## THE PENALTY PHASE

I. *Whether constitutional error resulted from a prosecutorial comment on Homick's exercise of his Fifth Amendment right to remain silent.* Homick insists that the prosecutor improperly commented on the exercise of his Fifth Amendment right to remain silent after he had presented his unsworn testimony pursuant to his common law right of allocution. *See* Griffin v. California, 380 U.S. 609, 615 (1965). During the guilt phase of the trial, Homick had exercised his constitutional right not to testify. In order to analyze the propriety of the prosecutor's conduct, it is helpful to explore the history and substance of the "right of allocution."

The right of allocution was recognized as early as 1689. *See* Green v. United States, 365 U.S. 301, 305 (1961), citing Anonymous, 3 Mod. 265, 266, 87 Eng. Rep. 175 (K.B.). Allocution constituted a formal address by the court to the defendant after he

---

[1] A pen register device monitoring Homick's phone line had been secured by the FBI in connection with a prior investigation. The device revealed that Homick had placed a call to the Tipton residence on December 2, 1985, and on the evening of the date of the murders. Homick had also asked a friend in the police department to run a check on the registration of two vehicles; both vehicles were registered to the Tiptons.

was convicted but prior to the imposition of sentence, inquiring as to whether there were any reasons why judgment should not be pronounced. Barrett, *Allocution,* 9 Mo. L. Rev. 115 (1944).

More recently, allocution has been viewed as the right of the defendant to stand before the sentencing authority and present an unsworn statement in mitigation of sentence, including "statements of remorse, apology, chagrin, or plans and hopes for the future." DeAngelo v. Schiedler, 757 P.2d 1355, 1358 (Or. 1988). Although the United States Supreme Court has declared that the right of allocution is not of constitutional derivation or dimension, it has been aptly stated that "it bespeaks our common humanity that a defendant not be sentenced to death by a jury 'which never heard the sound of his voice.'" State v. Zola, 548 A.2d 1022, 1045 (N.J. 1988) (quoting McGautha v. California, 402 U.S. 183, 220 (1971).

Importantly, however, the right of allocution is not without constraints. The New Jersey Supreme Court focused on the concern of the prosecution that a defendant should not "be permitted to lie with impunity to a jury that is attempting to reach a rational fact-based conclusion on whether he shall live or die." *Zola,* 548 A.2d at 1045. The *Zola* court wisely determined that a defendant "would not be permitted to rebut any facts in evidence, to deny his guilt, or indeed, to voice an expression of remorse that contradicts evidentiary facts." *Id. See also* State v. Mak, 718 P.2d 407 (Wash.), *cert. denied,* 479 U.S. 995 (1986) (allocution rule does not contemplate the defendant presenting evidence on the issue before the jury that would be unsworn, unrebuttable, uncross-examined and unanswerable by argument). The reasoning of the *Zola* and *Mak* courts is persuasive. Prior to commencing the penalty phase of trial and the imposition of sentence, issues of guilt and innocence have been considered and decided adversely to the defendant. They should not be reintroducible through an unsworn statement by the defendant under guise of the right of allocution.

We conclude that capital defendants in the State of Nevada enjoy the common law right of allocution.[2] However, if a defend-

---

[2]In Hardison v. State, 104 Nev. 530, 763 P.2d 52 (1988), we concluded that statutory rights to allocution did not apply in capital cases because of the more specific statutorily derived procedures for determining the appropriate punishment in first-degree murder cases. We therefore concluded that "*after* a jury has assessed a penalty of death, the judge has no discretion and must enter judgment according to the verdict of the jury. . . . Thus, a statement by [the defendant] in his own behalf would serve no function." *Id.* at 534-35, 763 P.2d at 55 (emphasis added). To the extent necessary, we clarify *Hardison.* As noted above, *Hardison* addressed the right of a defendant to

ant succeeds in abusing the right and extends his remarks beyond acceptable expressions of remorse, pleas for leniency, and plans or hopes for the future, into the realm of facts or circumstances relating to guilt or exculpation, "[t]hese types of facts are subject to rebuttal and form the basis for disputed issues which the trier of fact must resolve and, therefore, justify impeachment." Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and Constitutional Mitigation,* 15 N.M. L. Rev. 41, 63 (1985). We endorse and adopt the following ruling of the New Jersey Supreme Court in *Zola:*

> [W]e shall permit the narrowly-defined right of a capital defendant to make a brief unsworn statement in mitigation to the jury [or a three judge panel] at the close of the presentation of evidence in the penalty phase. Before a defendant speaks, he shall be instructed by the court, outside of the presence of the jury, of the limited scope of the right; that his statement is subject to the court's supervision; and that should the statement go beyond the boundaries permitted he will be subject to corrective action by the court including either comment by the court or prosecutor or in some cases possible reopening of the case for cross-examination.

*Zola,* 548 A.2d at 1046. *See also* State v. Bontempo, 406 A.2d 203, 213 (N.J.Super.Ct. Law Div. 1979) (a defendant who undertakes to answer part of the evidence against him in an unsworn statement is subject to comment as to factual thrusts he does not meet).

Having determined the proper latitude to be accorded defendants in the exercise of their right of allocution, we turn now to the facts of the instant case. Homick utilized his moment of allocution to stray far beyond facts in mitigation of sentencing or pleas

---

address the judge *after* sentence has been determined by the sentencing body (jury or three-judge panel) and there remains no sentencing discretion. Our ruling in the instant case affirms the right of a capital defendant to make an unsworn statement to the sentencing body *prior to* the determination of sentence.

In *Hardison,* the appellant also contended that the trial court had an affirmative duty to advise him of the possibility of giving an unsworn statement to the jury. Our response to the contention basically indicated that pursuant to NRS 175.552, Hardison had every opportunity to present any information in mitigation of punishment. Although our use of the word "information" as opposed to "evidence" may reflect an indication that Hardison would have been allowed to make an unsworn statement to the jury prior to the determination of sentence, we now eliminate doubt on the point and again stress the right of a capital defendant to make such a statement before the sentencing body reaches a determination concerning sentence. However, it is the obligation of defense counsel to advise the defendant of the right of allocution rather than the trial court.

for leniency; instead, Homick proclaimed his innocence and revisited facts and testimony of relevance only during the guilt phase of his trial. During his comments, he stated that "Michael Dominguez told me of who and what happened regarding Tipton." Homick also declared that "I never confessed to Tim Catt" and that the State's witnesses during the guilt phase were liars. These are precisely the type of improper remarks that justify prosecutorial impeachment if the trial judge fails to suppress their introduction by the defendant.

Here, the prosecutor responded to Homick's improper and unsworn comments by rhetorically asking the jury: "Did he tell you what Mike Dominguez told him? Has he told anybody what Michael Dominguez told him?" Far from constituting impermissible comment on the defendant's post-arrest silence, the prosecutor properly posed the questions in the form of rebuttal argument invited by Homick's unauthorized remarks. There was no error of constitutional dimension or otherwise.

II. *Whether the State's comments concerning the impact of the murders on the surviving members of the victims' families constituted reversible error.* Homick complains about two areas of comment made by the prosecutor in closing argument. The prosecutor stated:

> That's the only reason Marie Bullock doesn't breathe to this day is because he didn't want somebody looking at him and telling the police. Just like James Meyers, she was in the wrong spot at the wrong time. *It's the only reason her child is without a mother.*
>
> . . . .
> I'll tell you quite honestly I grieve for the family of Steve Homick. I am sure they have been traumatized by the charges and by these proceedings in a sense they're victims *just like Debbie Meyers and David Tipton and the family of Marie Bullock.*
>
> . . . .
> *It's interesting at this hearing how everything somehow gets turned upside down. It was all right for the defense to call witness after witness . . . .*

(Emphasis added.)

It is arguable that the underscored, passing remarks in the prosecutor's argument constituted improper victim impact comments under the rulings of Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 490 U.S. 805 (1989). *Booth* and *Gathers* both proscribed "victim impact" evidence during the penalty phase of a capital trial on grounds that such

evidence was per se barred by the Eighth Amendment. However, in the recent case of Payne v. Tennessee, 111 S.Ct. 2597 (1991), the *Booth* and *Gathers* cases were reevaluated and specifically overruled. The Court in *Payne* concluded that the Eighth Amendment posed no barrier to a capital sentencing jury considering "victim impact" evidence as it relates to the victim's personal character and the emotional impact of the murder on the victim's family nor precluded the prosecution from arguing this type of evidence at the capital sentencing hearing. The Supreme Court cited *Booth* for the proposition that the capital defendant must be treated as a "uniquely individual human being," *Booth,* 482 U.S. at 504, and that an individualized determination must be made based upon the "character of the individual and the circumstances of the crime." 482 U.S. at 502. The defendant may offer any relevant mitigating evidence in support of a sentence less than death. Eddings v. Oklahoma, 455 U.S. 104, 114 (1982). However, the *Payne* Court reasoned that a misreading of *Booth* has resulted in virtually limitless admissions of mitigating evidence concerning a defendant's own circumstances while the State has been barred from either offering "a glimpse of the life" which the defendant "chose to extinguish," Mills v. Maryland, 486 U.S. 367, 397 (1988) (Rehnquist, C. J. dissenting), or demonstrating the losses to the victim's family and to society which have resulted from the defendant's act of murder. *Payne,* 111 S.Ct. at 2607.

The *Payne* Court rectified the imbalance attributable to *Booth* and *Gathers,* as noted above, by ruling that:

> "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Booth,* 482 U.S., at 517 (White, J., dissenting) [citation omitted]. By turning the victim into a "faceless stranger at the penalty phase of a capital trial," *Gathers,* 490 U.S. at 821 (O'Connor, J., dissenting), *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

*Payne,* 111 S.Ct. 2608. We applaud the decision in *Payne* as a positive contribution to capital sentencing, and conclude that it fully comports with the intendment of the Nevada Constitution.

Homick urges us to disapprove of the ruling in *Payne* and

search for loftier heights in our own constitution. We are cautioned that otherwise defendants who murder more reputable and valued citizens will be more likely to suffer the imposition of death than the murderer who kills citizens of lesser stature. We find the argument unpersuasive. The key to criminal sentencing in capital cases is the ability of the sentencer to focus upon and consider both the individual characteristics of the defendant and the nature and impact of the crime he committed. Only then can the sentencer truly weigh the evidence before it and determine a defendant's just deserts. Apropos to the point is the statement by the venerable Justice Cardozo in Snyder v. Massachusetts, 291 U.S. 97, 122 (1934), that "justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

We would have great difficulty finding reversible error in the passing references of the prosecutor even under the *Booth* and *Gathers* standards. In any event, *Payne* is dispositive of the issue, and we therefore conclude that error did not result from the comments of the prosecutor regarding the surviving members of the victims' families. Homick created the evidence portraying the immutably tragic consequences to his victims and their loved ones. He is hardly in a position to complain that a jury of his peers was given a fair exposure to his handiwork.

III. *Whether error resulted from using both robbery and burglary in support of separate aggravating circumstances.* Homick contends that the district court erred in permitting the State to utilize both robbery and burglary as a basis for separate aggravating circumstances despite the commonality of facts underlying both. He maintains that the result of such a "stacking practice" is the arbitrary and capricious imposition of the death penalty. We are aware that certain jurisdictions among our sister states do not permit the use of multiple felonies occurring during "an indivisible course of conduct" as support for separate aggravating circumstances. People v. Harris, 679 P.2d 433, 449-50 (Cal.), *cert. denied,* 469 U.S. 965 (1984). We do not agree with the reasoning of those courts that preclude the use of multiple felonies committed in a continuous course of conduct, and have adopted a contrary position in Nevada.

In Wilson v. State, 99 Nev. 362, 376, 664 P.2d 328, 336 (1983), we stated:

> A logical reading of the statute [NRS 200.033(4)] requires that each felony be used as an aggravating circumstance. First degree murder is aggravated when it is committed

during the course of one of the enumerated felonies contained in NRS 200.033(4). Therefore, when the murder is committed during the course of more than one of the felonies listed, the murder is more aggravated and heinous than it would have been if only one of the felonies were present.

More recently, in Bennett v. State, 106 Nev. 135, 143, 787 P.2d 797, 802, *cert. denied,* 111 S.Ct. 307 (1990), we stated that "Nevada statutory and case law specifically authorize the use of multiple underlying felonies as aggravating circumstances . . . ." We reaffirm our rulings in *Wilson* and *Bennett* which are dispositive of this issue. Therefore, Homick's claim of error is without merit.

IV. *Whether uncorroborated evidence of homicides committed by Homick in California were properly admissible.* Homick claims that he was prejudiced by the introduction of evidence concerning homicides which he allegedly committed in California. This issue is also without merit. Under Nevada law, NRS 175.552, evidence which may or may not ordinarily be admissible under the rules of evidence may be admitted in the penalty phase of a capital trial as long as the questioned evidence is not supported solely by impalpable or highly suspect evidence. Young v. State, 103 Nev. 233, 237, 737 P.2d 512, 515 (1987). In Crump v. State, 102 Nev. 158, 716 P.2d 1387, *cert. denied,* 479 U.S. 871 (1986), we noted that our decision in Gallego v. State, 101 Nev. 782, 711 P.2d 856 (1985), *cert. denied,* 479 U.S. 871 (1986), held "that evidence that a defendant had committed an unrelated homicide for which he had not been convicted may be admitted during the penalty phase of the defendant's trial, not to establish the existence of an aggravating circumstance, but rather as 'other matter which the court deems relevant to sentence.'" *Crump,* 102 Nev. at 161, 716 P.2d at 1388 (citation omitted) (quoting NRS 175.552). The determination of whether to admit or exclude such evidence is left to the sound discretion of the trial court. *Gallego,* 101 Nev. at 791, 711 P.2d at 863.

In Homick's case, the evidence of the California homicides, concerning which charges were pending, was properly allowed by the district court. Evidence of the homicides was introduced through the testimony of a police officer based upon investigations conducted by California and Nevada law enforcement authorities. The evidence was neither impalpable nor highly suspect. There was no error.

## THE GUILT PHASE

I. *Whether the failure of the police to preserve notes of an*

*interview allegedly indicating an alibi for Homick constituted reversible error.* Homick insists that because a police detective failed to preserve his notes regarding an informal interview with Homick's ex-girlfriend concerning an alibi, his conviction must be reversed. The claim is meritless.

In Sparks v. State, 104 Nev. 316, 759 P.2d 180 (1988), we determined that lost evidence attributable to the State may constitute a basis for overturning a conviction when "(1) the defendant is prejudiced by the loss or, (2) the evidence was 'lost' in bad faith by the government." *Id.* at 319, 759 P.2d at 182. It is clear from the record that any prospect of advantage from having access to the lost notes was basically nullified when the interviewee formally recanted her earlier statements concerning an alibi for Homick. Moreover, the interviewee also testified at trial, making it clear that a luncheon involving Homick, and concerning which some alibi potential may have existed, did not occur.

Finally, Homick has not alleged bad faith on the part of the State in the failure to preserve the notes of the informal interview, and has not shown that the notes, even if they existed, would have been exculpatory and material to his defense. *See* Boggs v. State, 95 Nev. 911, 604 P.2d 107 (1979). Homick's assignment of error must fail.

II. *Whether prejudicial error occurred in the admission of evidence of prior bad acts.* Homick contends that he was prejudiced by error resulting from the admission of evidence concerning prior bad acts. We disagree. In no instance was such evidence admitted in violation of NRS 48.045(2), which prohibits the introduction of evidence of prior bad acts for purposes of showing character consistency. Evidence of the Maraldo and McDowell shootings was properly admitted to connect the Tipton murder weapon to Homick. The same weapon had been used in each instance, and the testimony of Dominguez concerning the Maraldo and McDowell incidents was essential to understanding why the same weapon used in those shootings was also used in the Tipton murders. Moreover, the testimony indicating that Homick provided cocaine to Dominguez was also relevant in showing the motive for Dominguez accepting the weapon from Homick to use in the attempted murder of Maraldo. *See* Bails v. State, 92 Nev. 95, 545 P.2d 1155 (1976) (where motive otherwise not established, evidence of defendant's drug use was permissible to show motive and identity). We need not consider evidence of the Godfrey murder because it was introduced by defense counsel in an attempt to shift blame for the Tipton murders to Michael Dominguez. Finally, it is apparent why there was no error in admitting evidence of Homick's threats against Catt and his girlfriend concerning the Tipton jewelry shown to Catt by

Homick. The evidence tied Homick to the Tipton crimes and explained why Catt delayed disclosing to the police his knowledge of Homick's involvement in the Tipton murders.

Our review of the record persuades us that evidence of the prior bad acts admitted by the district court, and now challenged by Homick on appeal, satisfied the criteria set forth by this court in Berner v. State, 104 Nev. 695, 765 P.2d 1144 (1988). Homick's claim of error is without merit.

**III.** *Whether an order in limine was violated by testimony elicited by the State.* Homick objects to references at trial to Dominguez' involvement in two California homicides. Homick suggests that the jury might have inferred from such references that Homick had a criminal past. The district court had ruled *in limine* that evidence concerning the double homicide would be excluded as unduly prejudicial. This court has determined that "the test for determining a reference to criminal history is whether 'a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity.'" Manning v. Warden, 99 Nev. 82, 86, 659 P.2d 847, 850 (1983) (quoting Commonwealth v. Allen, 292 A.2d 373, 375 (Pa. 1972)). The names of victims, the surrounding circumstances of other murders, and Homick's personal involvement or presence at the scene of another multiple slaying occurring months before the Tipton murders, were not revealed directly or indirectly to the jury. The references to the California slayings were limited to testing Dominguez' credibility on the stand. Therefore, the trial court's ruling on the Motion in Limine was not violated or undermined by the State.

**IV.** *Whether it was reversible error to disallow alibi testimony attributable to Lawrence Ettinger.* Homick challenges the trial court's ruling disallowing testimony by Detective Dillard concerning alleged alibi evidence in the form of a hearsay statement attributable to Homick's cohort, Lawrence Ettinger. The statement, given at a time when Ettinger had a motive to lie in a manner that would benefit Homick, was unreliable. Moreover, any semblance of corroboration for the hearsay was eliminated when Susan Hines recanted her informal statement parallelling Ettinger's. The hearsay statement was properly excluded by the trial court pursuant to NRS 51.345(1), which makes inadmissible any statement which tends to expose the declarant to criminal liability and is offered to exculpate the accused without support in the form of clearly trustworthy corroborating circumstances.

**V.** *Whether the trial court erred in refusing Homick's instruc-*

*tion listing residual doubt as a mitigating circumstance.* Homick contends that he was entitled to a special jury instruction listing residual doubt as a mitigating circumstance. He is wrong. We are in accord with the Court's ruling in Franklin v. Lynaugh, 487 U.S. 164 (1988), that there is no constitutional mandate for a jury instruction in a capital case making residual doubt a mitigating circumstance. The district court was correct in refusing such an instruction.

VI. *Whether there was sufficient evidence to prove Homick's guilt beyond a reasonable doubt.* We are urged to reverse Homick's judgment of conviction on the ground that there was insufficient admissible evidence to prove his guilt beyond a reasonable doubt. Our review of the record persuades us to the contrary. The State's case against Homick was extremely strong.

Although we have found no basis in this record for doubting the accuracy of the jury's conclusions, we nevertheless note that our review is based upon the standard that it is not "whether this Court is convinced of the defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could have been convinced to that certitude by the evidence it had a right to consider." Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). Based upon our review of the evidence, we must conclude that the jury, acting reasonably, had more than substantial evidence upon which to determine, with the requisite degree of certitude, that Homick was guilty of the crimes charged against him.

We have carefully considered Homick's other assignments of error and conclude that they are without merit. Additionally, we note that the jury found four aggravating circumstances and no mitigating circumstances. The evidence fully supports the jury's finding, beyond a reasonable doubt, that Homick's crimes were aggravated by: (1) the murder of the three victims by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person; (2) the three murders were committed while the person was engaged in the commission of or an attempt to commit any burglary; (3) the three murders were committed while the person was engaged in the commission of or an attempt to commit any robbery; and (4) the three murders were committed to avoid or prevent a lawful arrest.

In reviewing the overall record, we conclude that the sentence of death imposed on Homick by the jury was not the result of passion, prejudice or any arbitrary factor and that the sentence

was not excessive, considering both the extremely serious nature of Homick's crimes and the individual characteristics and background of the defendant.

Having determined that Homick was fairly tried, convicted, and sentenced, we affirm in all respects the judgment of conviction and the sentences imposed thereon, including the sentence of death.