*1001
 
 OPINION
 

 Per Curiam:
 

 In November 1992, appellant Donald William Sherman (“Sherman”) met Dianne Bauer (“Dianne”) in Longview,
 
 *1002
 
 Washington. The two became romantically involved, and near Christmas 1992, Sherman moved into Dianne’s house. Also living in this house was Dianne’s daughter, Jessica Bauer (“Jessica”). Sherman moved in and out a number of times between 1992 and January 1994 as the couple split up and reunited.
 

 During this time, Sherman worked sporadically. Dianne supported Sherman with the earnings from her hair salon, money from a trust fund set up by her grandmother, and money from her father, Dr. Lester Bauer (“Bauer”) who was a resident of Las Vegas and the victim in this case. However, Dianne never told her father of the relationship. By the time the couple finally separated permanently in late 1993 or early 1994, they had spent the entire trust fund (about $100,000.00). Dianne had also withdrawn, without her father’s permission, approximately $10,000.00 from a joint account which she held with him.
 

 After Sherman and Dianne broke up in January 1994, both moved to Alaska. One evening as Dianne was driving home, she saw Sherman in a car with another woman. Sherman looked at Dianne and pantomimed shooting a gun. Dianne flipped him off and, upset by the confrontation, pulled off the highway. (This event will be referred to as the “Alaska highway incident.”)
 

 During the first part of May 1994, Dianne became concerned for her father’s safety. Although her father lived in Las Vegas, Dianne communicated her concerns to the police in Longview, Washington, and an FBI agent whom she knew in Washington.
 

 On June 1, 1994, Rita Klingensmith (“Klingensmith”), Bauer’s neighbor, noticed that Bauer had failed to bring his newspaper inside for several days. Klingensmith attempted to call Bauer several times, but his phone was busy. Klingensmith notified the community security force of this, but they declined to call the Las Vegas police, so Klingensmith did so herself.
 

 Cora Flanagan (“Flanagan”) of the Las Vegas Metropolitan Police Department responded to Klingensmith’s call. When she arrived at the house, she noted that all the doors were locked. Flanagan phoned a locksmith, but while she was waiting for him to arrive, she noticed that a window was slightly ajar and the screen was on backwards. In the presence of a community security officer and a representative of the homeowners association, Flanagan opened the window and climbed into a bedroom. Flanagan then walked to another room and found Bauer’s body. Flanagan phoned for paramedics, who confirmed that Bauer was dead. Flanagan then called homicide detectives.
 

 Las Vegas police crime scene analysts Daniel Ford (“Ford”) and Joseph Matvay (“Matvay”) inspected the Bauer residence. Ford found Bauer lying face up on a blood-soaked bed in a room with blood spattered on the walls, ceiling, and overhead ceiling
 
 *1003
 
 fan. Matvay examined the exterior of the house. He determined that the perpetrator had entered through the same window that Flanagan had entered. Two other windows showed signs of an attempted forced entry. Matvay noted that the house had been thoroughly ransacked. A black sock, which may have been used to wipe off fingerprints, was found atop a desk. The house was dusted for fingerprints, one of which was later determined to match those of Sherman.
 

 Medical examiner Dr. Robert Jordan (“Jordan”) performed the autopsy. Jordan found five full thickness lacerations on Bauer’s scalp. These wounds were crescent shaped and surrounded by widely spread areas of contusion. Based upon this autopsy, Jordan determined that Bauer had died from several blows to the head with a hammer. Jordan was unable to state with certainty when Bauer was killed, but it seemed likely that the death occurred sometime between the night of May 29 and the early morning of May 30, 1994.
 

 On May 28, 1994, Sherman checked into the Ogden House, a hostelry adjacent to, and operated by, the El Cortez Hotel in Las Vegas. He stayed there for three days and paid cash for his room.
 

 On May 30, 1994, at approximately 1 p.m. Carrie Wilkins (“Wilkins”), an employee of Swinging Susie’s escort agency, received a call from someone who identified himself as Donald Sherman. The caller stated that he was a doctor and he wished to procure the services of a busty blonde. Wilkins told Sherman that she would send a woman named “Paige” to the Ogden House. Wilkins quoted Sherman a price of $175.00.
 

 Paige went to Sherman’s room at the Ogden House. Sherman introduced himself to her as Dr. Lester Bauer. He paid the $175.00 escort service charge, plus an additional $500.00 charge to Paige, with Bauer’s American Express card. Paige asked Sherman for photographic identification, but he responded that he had none, offering instead a car title and a bank card with Bauer’s name on it. Despite this lack of identification, Paige accepted the card as payment. On May 31, 1994, Sherman again procured Paige’s services by using Bauer’s American Express card. Some days later, Paige heard about the murder of Bauer. She contacted the police and turned over the relevant credit card receipts and phone logs.
 

 On May 31, 1994, Micky Juarez (“Juarez”), a motel manager in Santa Barbara, California, registered someone identifying himself as Dr. Lester Bauer at the Plaza Inn Motel. The motel guest paid for his room with Bauer’s American Express card and left the following morning.
 

 On June 2, 1994, Officer Gary Gillingham (“Gillingham”) of the Santa Barbara police approached a parked automobile with
 
 *1004
 
 Nevada registration. Although the engine was running and the radio was on, the driver appeared to be sleeping. Gillingham called in the license plate number and learned that the automobile had been reported stolen. Gillingham requested additional police support. When the other officers arrived, Gillingham reached into the driver’s side window, turned off the ignition, and arrested the driver, who proved to be Sherman.
 

 Sherman had on his person two credit cards belonging to Bauer. He also had a number of credit card receipts which were signed with Bauer’s name. In addition, the automobile was registered to Bauer. Although Sherman appeared mildly intoxicated, he did not seem to be under the influence of any controlled substance other than alcohol.
 

 On June 5, 1994, Ford, the Las Vegas crime scene analyst, flew to Santa Barbara. Ford photographed the car which Sherman had been driving and searched for latent fingerprints, none of which were found. Ford and the Santa Barbara police had found a number of items in the car, including silverware, candlesticks, and various other valuables.
 

 Bauer’s son, Bruce Bauer (“Bruce”), and Dianne were told of the murder soon after it was discovered. Bruce travelled to Las Vegas and helped the police determine what had been taken from the house. Many of the items which Bruce said had been taken were located in the trunk of the car in which Sherman had been found. Dianne, who travelled to Las Vegas when she heard of the murder, also thought that a number of items were missing from the house.
 

 In July 1994, Sherman was in custody in Idaho for a parole violation.
 
 [1]
 
 He spoke with John McCoy (“McCoy”), an Idaho parole commission hearing officer. Sherman told McCoy that if he returned to Nevada, he would die. Sherman stated that he had killed someone for molesting Dianne’s daughter. In addition, while in custody in the Clark County Detention Center, Sherman told Joe Hulbert (“Hulbert”), a Las Vegas police officer, that he had killed a doctor in Las Vegas, that he had used a hammer, and that the murder was “pretty messy.” Sherman told Hulbert that he had confronted the doctor about molesting Jessica and that the confrontation had escalated to Bauer’s killing.
 
 [2]
 
 Sherman stated that he expected to be sentenced to death.
 

 The State of Nevada charged Sherman by indictment with the murder of Bauer and the associated burglary and robbery. On
 
 *1005
 
 January 27, 1997, the trial began. On February 5, 1997, the jury returned guilty verdicts on all counts. The penalty phase began on February 6, 1997.
 

 During the penalty phase of the trial, Andrew Anderson (“Anderson”) of the Sandpoint, Idaho Police Department testified as to Sherman’s prior conviction for first degree murder. In 1981, Sherman, then seventeen years old, had been involved in the robbery of a small grocery store. During the course of the robbery, Sherman shot the owner to death. The prosecution agreed not to seek the death penalty and to drop the robbery and burglary charges in exchange for Sherman’s plea of guilty to the first degree murder charge. Sherman was sentenced to life in prison. He was paroled in 1992.
 

 Scott Zolman (“Zolman”), a Las Vegas corrections officer, testified during the penalty phase that on October 25, 1995, during a routine shakedown, Zolman had discovered a shank in Sherman’s mattress. An administrative board found Sherman guilty of possession of contraband.
 

 Tony Garribay (“Garribay”), a Las Vegas corrections officer, testified that on October 10, 1996, a public defender telephoned Sherman in jail. Garribay told Sherman that he was otherwise occupied and could not take him to accept the call, but that the attorney could make an appointment. Sherman became very upset and yelled to Garribay, “I’ll get you when I get out.” At another time, Sherman had told Garribay that “I’m going to kick your fucking ass when I get out of here; whatever it takes, you and I, one-on-one.’ ’
 

 Garribay further testified that while Sherman was in jail awaiting trial, he and Michael Placencia (“Placencia”), an inmate, formed a plan to escape. Placencia was to ask a friend of Sherman’s from jail to make arrangements for Sherman to have an eye doctor appointment. When Sherman would go to the eye doctor, he and Placencia would, with the help of a third party, secure firearms and kill the corrections officers and the optometrist. Sherman had written instructions of the plan to Placencia which concluded with the statement: “Oh yeah; pop them for three. Wounding is dangerous. Do it right.’ ’
 

 The plan was never executed because Placencia agreed to cooperate with the police investigation of the escape plan. Placencia gave police the instructions which Sherman had given him; he also wore a wire during a conversation with Sherman in which plans for the escape were discussed. Sherman was charged by grand jury indictment with solicitation to commit murder. The case was still pending at the time of Sherman’s murder trial.
 

 Dante Tromba (“Tromba”), another Las Vegas corrections officer, testified that he overheard Sherman telling another inmate
 
 *1006
 
 that he was prepared to “take out the next officer that fucked with him,” and that he was going to “beat the shit out of Garribay.”
 

 Sherman presented the testimony of Dr. Stephen Pittel (“Pittel”), a psychologist. Pittel testified that Sherman’s upbringing tended to predispose him toward drug abuse and violent behavior. He also stated that it was likely that Sherman was under the influence of both alcohol and methamphetamine when he was arrested in Santa Barbara and that this may have caused his violent behavior.
 

 On February 11, 1997, the jury returned its penalty verdict. The jury found four aggravating circumstances: (1) that Sherman had committed this murder while under sentence of imprisonment; (2) that Sherman had been previously convicted of another murder; (3) that Sherman had committed the murder while engaged in the commission of a burglary; and (4) that Sherman had committed the murder while engaged in the commission of a robbery. The jury found three mitigating factors as well: (1) that the murder was committed while Sherman was under the influence of extreme mental or emotional disturbance; (2) that Sherman acted under duress or under the domination of another person; and (3) any other mitigating circumstances. After weighing the aggravators and mitigators, the jury imposed a sentence of death.
 

 The judgment was filed on April 21, 1997. On that same day, Sherman filed his notice of appeal.
 

 GUILT PHASE ISSUES
 

 First, Sherman argues that the trial court erred when it excluded testimony regarding Dianne’s relationship with her father which, he argues, would have shown a lesser degree of culpability on his part. We conclude that this argument is meritless.
 

 Extrinsic evidence of specific instances of conduct may not be used to attack the credibility of a witness; however, such instances are properly the subject of cross-examination. Rembert v. State, 104 Nev. 680, 683, 766 P.2d 890, 892 (1988); NRS 50.085(3). In addition, it is within the sound discretion of the trial court to exclude evidence which is otherwise admissible if its probative value is substantially outweighed by the danger of confusing the issues or misleading the jury. Kazalyn v. State, 108 Nev. 67, 71, 825 P.2d 578, 581 (1992); NRS 48.035(1). This court will not set aside the district court’s ruling to admit or exclude evidence unless it is manifestly wrong. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985).
 

 In this case, defense counsel asked Dianne on cross-examina
 
 *1007
 
 tion whether she had told anyone that she resented her parents for placing her in a reform school, whether she had ever told anyone that her father had molested her, and whether she sought to manipulate her father for personal financial gain. Dianne testified that she had never said or done these things. Sherman sought to introduce the testimony of certain witnesses who would testify that Dianne had told them that her father had molested her as a child, that she disliked and resented him, and that she was eager to obtain an inheritance from him. In addition, Sherman sought to introduce testimony that the Alaska highway incident did not occur as Dianne said it did. The State moved to exclude this evidence. The district court granted the State’s motion on the grounds that this evidence was relevant only as a collateral attack on Dianne’s credibility as a witness.
 

 Sherman argues that this testimonial evidence, rather than simply attacking Dianne’s credibility as a witness, tended to support his theory of the case. Sherman’s argument here is somewhat confusing, but he seems to contend that had he been able to adduce this testimony at trial, the jury could have found that he lacked the level of intent required for first degree murder. Dianne, Sherman posits, had somehow provided the impetus for him to make the trip to Las Vegas by playing upon his feelings about child abuse. Sherman contends that at the time he entered Bauer’s house, he intended only to talk to Bauer about Bauer’s relationship with Dianne; only after he was inside the house did he lose his temper. Sherman argues that had he been able to develop more fully this theory, the jury may have found him guilty of only second degree murder.
 

 When Sherman made this argument before the district court, it implicitly found that the evidence was not relevant for any purpose other than impeachment or that any relevancy the testimony had toward proving Sherman’s theory was substantially outweighed by the risk of misleading the jury or confusing the issues. After a thorough review of the record, we conclude that this determination was not manifestly wrong and that, therefore, the district court did not abuse its discretion in excluding it.
 

 Furthermore, even if the evidence was wrongly excluded, this constitutes harmless error. Sherman was able to argue this theory extensively during closing argument. While the jury found Sherman guilty of first degree murder, they also found, as a mitigating factor, that he acted under duress or domination of another person, presumably Dianne. Notwithstanding this mitigator, the jury sentenced him to death. Thus, the jury implicitly found that Sherman was manipulated by Dianne, but that this manipulation did not significantly reduce his culpability in the matter.
 
 *1008
 
 Therefore, we conclude that even had the evidence at issue been presented at trial, the jury would not have found that Sherman was either innocent or guilty of a lesser included offense.
 

 Second, Sherman argues that the district court abused its discretion by denying his motion for mistrial which was made following conclusion of the guilt phase. Sherman argues that throughout the trial, the State introduced and referred to evidence of prior bad acts in violation of NRS 48.045(2). The State counters that no such evidence was introduced. We conclude that Sherman’s argument lacks merit.
 

 NRS 48.045(2) provides that “[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.” This court has held that the test for determining whether the State has referred to a defendant’s criminal history is whether a juror could reasonably infer from the facts presented that the defendant had engaged in prior criminal activity. Homick v. State, 108 Nev. 127, 140, 825 P.2d 600, 608 (1992). Because improper references to prior criminal acts affect the presumption of innocence, the admission of such references violates due process and requires reversal unless the reviewing court determines that the error was harmless beyond a reasonable doubt. Manning v. Warden, 99 Nev. 82, 86-87, 659 P.2d 847, 850 (1983) (citing Chapman v. California, 386 U.S. 18, 24 (1967)).
 

 Sherman argues that the State improperly elicited testimony from Dianne which implied that Sherman had a history of federal criminal activity. On cross-examination, Dianne stated that when she became concerned for her father’s safety, she called the FBI in Washington State. On redirect, the following exchange took place:
 

 [Prosecutor]: Is the reason you called the FBI in Seattle, rather than someplace else, because you knew someone there, you had a relationship, and you called a FBI officer?
 

 [Dianne]: I can’t remember the man’s name, but I spoke to him once before in regards to you.[
 
 3
 
 ]
 

 In addition, the prosecutor stated in closing arguments that “[Dianne] called an FBI agent . . . that she had previously contacted about some problems she had with Sherman.”
 
 [4]
 

 
 *1009
 
 In
 
 Manning,
 
 a police detective testified at trial that the victim had said that the perpetrator was “a young man named Sid or Benny.” The officer then testified that ‘‘when she mentioned Benny, I knew of Benny Manning [the defendant] myself.’ ’ This court held that this created a clear inference that the defendant had been involved in prior criminal activity.
 
 Manning,
 
 99 Nev. at 86, 659 P.2d at 849-50.
 

 Similarly, we conclude that Dianne’s testimony and the State’s closing argument in this case created a reasonable inference of prior criminal activity on Sherman’s part. Dianne did not testify to any personal or social relationship between herself and the FBI agent whom she called; she said only that she called him because of problems with Sherman. Thus, we conclude the jury could reasonably infer that she spoke with him initially because the problems which she was having with Sherman were of a criminal nature.
 

 However, we conclude that this error was harmless beyond a reasonable doubt. The evidence against Sherman was overwhelming. Although he had never even met Bauer, his fingerprint was found at Bauer’s house. Sherman used Bauer’s credit card to pay for escort services and hotel rooms. When Sherman was arrested in Santa Barbara, he was in possession of Bauer’s car and other personal property. Sherman told at least two people, McCoy and Hulbert, that he had killed someone in Nevada. Therefore, we conclude that the district court did not abuse its discretion by denying Sherman’s motion for mistrial.
 

 Third, Sherman argues that the district court erred by failing to grant a motion for mistrial based on an alleged violation of an order in limine which prohibited the State from introducing evidence of prior bad acts of physical abuse on Sherman’s part.
 

 On December 6, 1996, Sherman moved in limine to .exclude evidence that he had physically abused Dianne. The district court granted this motion. In the State’s opening statement, the prosecutor said of Dianne and Sherman’s relationship: “It was an abusive, unstable relationship and, eventually, Dianne broke [it] off.’ ’ In addition, the prosecutor mentioned the Alaska highway incident during opening statements. Immediately following opening statements, Sherman moved for a mistrial. The district court denied this motion, finding that the statements made by the prosecutor were not references to the incidents of physical abuse.
 

 We conclude that a reasonable juror would have inferred that the first statement at issue was a reference to prior incidents of physical abuse. Although the prosecutor could well have intended the statement at issue to indicate verbal or emotional abuse as well
 
 *1010
 
 as physical abuse, he did not specify the type of abuse. It seems more likely than not that a juror hearing only that the relationship was “abusive” would have assumed that Sherman physically abused Dianne.
 

 However, we conclude that this error was harmless. As discussed above, the evidence of Sherman’s guilt was overwhelming. Furthermore, any alleged physical abuse is a collateral issue; if Sherman had been charged with the murder of Dianne, evidence of past physical abuse would have been highly prejudicial. In contrast, we conclude that the prosecutor’s single reference to an abusive relationship with Dianne did not unduly influence the jury’s verdict regarding Bauer’s murder.
 

 Finally, the Alaska highway incident was simply not physical abuse; Sherman and Dianne were in separate cars at the time. Therefore, we conclude that the district court did not abuse its discretion by denying Sherman’s motion for mistrial.
 

 Fourth, Sherman argues that the prosecution committed reversible misconduct by stating during closing arguments that Dianne had looked at Sherman and called him a creep, when, in fact, this statement had been stricken from the record.
 

 This court has held that in order for prosecutorial conduct to constitute reversible error, it must be prejudicial and not merely harmless. Ross v. State, 106 Nev. 924, 928, 803 P.2d 1104, 1106 (1990). Error is harmless if without reservation, the verdict would have been the same in the absence of error. Witherow v. State, 104 Nev. 721, 724, 765 P.2d 1153, 1156 (1988).
 

 During the State’s closing argument, the following exchange occurred:
 

 State: Ladies and Gentlemen, there is a killer in this courtroom. You have been looking at him throughout the trial. So have the witnesses. He is the person who Dianne Bauer looked at and called a creep.
 

 Defense: I’m going to object, Your honor. That was stricken from the record. It’s improper to argue things that were stricken.
 

 State: It’s been stricken from the record and I would ask you to disregard that; but the evidence suggests that he is the killer and that’s Donald Sherman.
 

 Based upon a thorough review of the record, we conclude that although even an unwitting reference to stricken testimony consti
 
 *1011
 
 tutes prosecutorial misconduct, the verdict would have been the same in the absence of this error. As discussed above, the evidence against Sherman was overwhelming. Therefore, we conclude that the prosecutor’s comments do not constitute reversible error.
 

 PENALTY PHASE ISSUES
 

 First, Sherman argues that the district court erred by instructing the jury, during the penalty phase, that “[a] verdict may never be influenced by sympathy, prejudice, or public opinion.” Sherman argues that this instruction “violated [his] Eighth Amendment rights because it undermined the jury’s constitutionally mandated consideration of mitigating evidence.”
 

 This court has recently held that “[a] district court may instruct the jury not to consider sympathy during a capital penalty hearing, as long as the court also instructs the jury to consider mitigating facts.” Rippo v. State, 113 Nev. 1239, 1262, 946 P.2d 1017, 1032 (1997) (citing Riley v. State, 107 Nev. 205, 215-16, 808 P.2d 551, 557 (1991)).
 

 In this case, the court instructed the jury to consider mitigating factors. Therefore, we conclude that the anti-sympathy instruction was proper.
 

 Second, Sherman argues that his death sentence was imposed in an arbitrary and capricious manner because the jury found separate aggravating circumstances, under NRS 200.033, based on the same underlying facts. We conclude that this contention is also meritless.
 

 Sherman contends that the aggravating circumstances of “committed by a person under a sentence of imprisonment” and “committed by a person who was previously convicted of another murder” should not have been charged or found as separate and distinct aggravators because they were based upon the same essential fact: Sherman’s previous murder conviction. Similarly, Sherman argues that the aggravating circumstances of “committed by a person engaged in a robbery” and “committed by a person engaged in a burglary” were based upon the same set of facts: the looting of Bauer’s house.
 

 Sherman cites case law from other jurisdictions in support of his position. However, this court has specifically considered and rejected each of Sherman’s contentions. In Geary v. State, 112 Nev. 1434, 1447-48, 930 P.2d 719, 728 (1996),
 
 reh’g granted on other grounds,
 
 114 Nev. 100, 952 P.2d 431 (1998), the defendant argued that his due process and double jeopardy rights were vio
 
 *1012
 
 lated when he was sentenced to death based upon the aggravators of “committed by a person under a sentence of imprisonment” and “committed by a person who was previously convicted of another murder,’ ’ both of which were based upon a prior murder conviction. This court rejected the argument, stating:
 

 The first aggravating circumstance advances the state’s interest in punishing more harshly those who commit murder after having been granted the privilege of parole, and the second aggravator advances the state’s interest in punishing more harshly repeat offenders.
 

 Id.
 
 at 1448, 930 P.2d at 728.
 

 This court has also held that the use of both robbery and burglary as aggravating factors does not infringe upon a defendant’s due process or double jeopardy rights. Homick v. State, 108 Nev. 127, 137-38, 825 P.2d 600, 607 (1992) (citing Wilson v. State, 99 Nev. 362, 664 P.2d 328 (1983)).
 

 We conclude that Sherman presents no compelling reason for this court to reverse these holdings. Therefore, we conclude that the aggravating circumstances were properly charged and found by the jury.
 

 Third, Sherman argues that the district court erred by admitting improper evidence during the penalty hearing. We conclude that this argument lacks merit.
 

 The trial court’s determination regarding the admissibility of evidence during a sentencing hearing will not be disturbed on appeal absent an abuse of discretion. Wesley v. State, 112 Nev. 503, 519, 916 P.2d 793, 804 (1996). Furthermore, during a penalty hearing, “evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.” NRS 175.552(3);
 
 see also
 
 Allen v. State, 99 Nev. 485, 488, 665 P.2d 238, 240 (1983). However, the district court may not admit evidence that is impalpable or highly suspect. Young v. State, 103 Nev. 233, 237, 737 P.2d 512, 515 (1987). With these standards in mind, we turn to Sherman’s specific claims of error.
 

 Sherman asserts that certain testimony by Detective Anderson of the Sandpoint, Idaho Police Department was irrelevant. Anderson testified that he had spoken with and observed Sherman during Sherman’s 1981 murder investigation and trial, and based
 
 *1013
 
 on this he had been able to form an opinion regarding Sherman’s character. Anderson further testified that Sherman was “very street smart and . . . very manipulative” and that Sherman was “highly dangerous.” Sherman made a timely relevance objection.
 

 We conclude that this testimony was relevant to show that Sherman could be dangerous in the future, which is a consideration before the jury during sentencing. It is true that Anderson was testifying as to his fifteen-year-old impression of Sherman, and as a homicide detective, he was perhaps predisposed toward a heightened suspicion of those under investigation for murder. However, these factors go to the weight, rather than the admissibility, of the evidence. Therefore, we conclude that this testimony was not impalpable or highly suspect, and therefore, the district court did not err in admitting it.
 

 Sherman also argues that the court erred in admitting testimony as to the effect which Sherman’s prior murder had on the community of the previous victim. Anderson testified that Sherman’s previous victim had a wife and children, that the victim, had been a well known member of the community, and that the community was quite incensed at the killing.
 

 Sherman correctly cites Payne v. Tennessee, 501 U.S. 808 (1991), for the proposition that victim impact evidence is admissible concerning the crime for which the defendant is on trial. Sherman argues that because the
 
 Payne
 
 court did not specifically allow the admission of victim impact evidence from previous crimes, the United States Supreme Court indicated that such evidence was constitutionally impermissible. However, the Supreme Court was not presented with that particular question in
 
 Payne;
 
 its silence is not dispositive. Rather,
 
 Payne
 
 allows victim impact testimony from the instant crime. Just as characteristics of the defendant may mitigate the sentence imposed, so too are characteristics of the victim relevant to the factfinder’s sentencing decision. Thus, the Supreme Court held the constitution does not bar states from allowing victim impact testimony from the instant crime during criminal sentencing proceedings.
 
 Id.
 
 at 822, 825.
 

 NRS 176.015 provides that during the sentencing hearing, the court shall afford the victim or relatives of the victim the opportunity to “[rjeasonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution.” NRS 200.033(2) provides that a previous murder by the defendant is an aggravating factor. This court has held that this aggravator “advances the state’s interest in pun
 
 *1014
 
 ishing more harshly repeat offenders.”
 
 Geary,
 
 112 Nev. at 1448, 930 P.2d at 728.
 

 Thus, evidence of the impact which a murder had on the victim’s family is relevant to show the damage done by the murder; evidence of previous murders is relevant to show only that a statutory aggravating circumstance exists making the defendant death eligible. In contrast, evidence of the impact which a previous murder had upon the previous victim is not relevant to show either of these facts. Furthermore, while victim impact testimony and evidence of prior murders are specifically authorized by statute, no Nevada statute exists which provides for the admission of evidence regarding the impact of prior murders. Therefore, we conclude that the impact of a prior murder is not relevant to the sentencing decision in a current case and is therefore inadmissible during the penalty phase.
 

 In the present case, we conclude that this error was harmless. Anderson’s testimony was limited to only a few statements regarding the previous victim’s standing in the community. Had these statements not been admitted, the evidence would still have supported the jury’s finding of four aggravating factors. The circumstances of the instant murder reveal a particular brutality on Sherman’s part; he broke into an elderly gentleman’s house and bludgeoned him to death with a hammer, then looted the house and used the victim’s credit cards to pay for hotel rooms and escort services. Based upon this, we conclude that beyond a reasonable doubt, the jury would have sentenced Sherman to death even had the prior victim impact evidence not been admitted.
 

 Fourth, Sherman argues that the trial court should have granted a motion for mistrial based upon the testimony of Officer Tromba, who testified that he overheard Sherman say that “he was 17 when he killed his first man in prison.” Sherman did not object to this statement at the time it was made, but moved for a mistrial soon thereafter. Sherman argued that this statement gave the false impression that he had killed someone in prison in addition to the Idaho murder. When Sherman made this motion, the State offered to stipulate before the jury that the statement should have been that “[Sherman] killed his first person and went to prison when he was 17.” However, Sherman declined this stipulation because he did not wish to highlight this fact for the jury.
 

 The offered stipulation would have cured any false impression caused by Tromba’s testimony. We conclude that Sherman may not refuse such a stipulation for tactical reasons and then claim
 
 *1015
 
 reversible error on appeal. Therefore, we conclude that the district court did not err by denying Sherman’s motion for mistrial.
 

 Fifth, Sherman argues that the State made certain improper arguments during the penalty phase of the trial which require reversal. Sherman first contends that the State impermissibly told the jurors that they should vote against Sherman and in favor of future victims. Second, Sherman argues that the State improperly commented upon Sherman’s lack of remorse.
 

 Prosecutors may properly argue that the defendant’s past conduct suggests that even incarceration will not dissuade the defendant from endangering other lives. However, this court has held that it was improper for a prosecutor to argue that the jury should return a death penalty on behalf of future victims.
 
 See
 
 Schoels v. State, 114 Nev. 981, 966 P.2d 735 (1998). Thus, while a prosecutor may argue that the death penalty should be imposed because the defendant may pose a risk in the future, the prosecutor may not seek a death sentence by using improperly inflammatory rhetoric.
 

 In the case here, the prosecutor argued:
 

 Can we be guaranteed that for the next 30 or 40 years, a person who is sitting in prison the rest of his life is not going to flare up and get angry at a guard, like he did at the Clark County Detention Center ....
 

 So the question is simply this: Do we execute a person who has killed not once, but two times, or do we risk the execution of some very innocent people?
 

 We conclude that these comments go beyond what is permissible argument under
 
 Schoels.
 
 The prosecutor here framed his future dangerousness argument in terms which posed a very stark choice for the jurors: they could either vote to execute Sherman or vote to risk the “execution” of a future victim. Thus, the prosecutor asked the jury to either align themselves with future innocent victims or with the man they had just convicted of murder. In addition, the prosecutor’s use of the word “execution” in this context was extremely inflammatory. In
 
 Schoels,
 
 we condemned this kind of rhetorical excess. Thus, we conclude that the prosecutor’s comments here were improper.
 

 However, we conclude that this error was harmless.
 
 See Schoels,
 
 114 Nev. at 989, 966 P.2d at 740. For the reasons enumerated above, overwhelming evidence supported the jury’s finding of four aggravating factors. Thus, it is clear, beyond a reasonable doubt, that even had the prosecutor not made these
 
 *1016
 
 improper closing arguments, the jury would still have returned a sentence of death.
 

 Sherman also argues that the State violated his Fifth Amendment right against self-incrimination by commenting on his lack of remorse during closing arguments. The State counters that Sherman opened the door to these comments by arguing that the death penalty should be reserved only for those who “kill without remorse.”
 

 In Brown v. State, 113 Nev. 275, 291, 934 P.2d 235, 245-46 (1997), this court held that the district court violated the defendant’s Fifth Amendment rights by imposing a harsher sentence because the defendant refused to admit his crime.
 

 Here, the defense stated during closing arguments that “[t]he death penalty should be reserved for the most thoughtless, remorseless, cold-blooded killers .... those people would be people who kill without remorse.” Thus, the defense implied that Sherman was not one of those who kill without remorse and therefore should not be executed. In rebuttal, the State argued:
 

 [Defense counsel] talks about remorse.
 

 Where's the remorse in this case? Where is the remorse, hours later, after the defendant has killed a human being?
 

 In his own words: it was a messy one.
 

 What remorse did he show, but to get on the phone lines and hire an escort so he could have sex?
 

 Where was the remorse when he talked to John McCoy and told him about the killing?
 

 We conclude that this case is distinguishable from
 
 Brown.
 
 In
 
 Brown,
 
 the court demanded that the defendant either own up to the charged crime or risk a longer sentence. Here, the State merely argued, based upon Sherman's prior actions, that Sherman had not shown any sign of the remorse which the defense implied he had felt. Therefore, we conclude that the prosecutor did not make improper comments during closing arguments.
 

 Finally, in cases where the death penalty is imposed, in addition to those errors enumerated on appeal, NRS 177.055(2) requires this court to consider (1) whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor; (2) whether the death sentence is excessive considering the crime and the defendant; and (3) whether the evidence at trial supports the finding of aggravating circumstances. We conclude that the death penalty was not, in this case, imposed under the influence of passion, prejudice, or any arbitrary factor, nor was it excessive considering the brutal nature of the crime and the
 
 *1017
 
 defendant. Furthermore, we find that the evidence in the record supports the jury's finding of aggravating circumstances.
 

 We, therefore, find that none of Sherman’s arguments has merit. Accordingly, we affirm the judgment of the district court.
 
 [5]
 

 [1]
 

 The record is unclear as to how Sherman arrived in Idaho after his Santa Barbara arrest. Apparently Sherman's Idaho parole was revoked immediately after his arrest in Santa Barbara. Additionally, it is not clear when he was subsequently moved from Idaho to Las Vegas.
 

 [2]
 

 Except for these two statements made by Sherman, there is no evidence showing that Bauer molested Jessica.
 

 [3]
 

 It is not clear from the record to whom Dianne is here referring. However, it seems most likely that she was referring to Sherman.
 

 [4]
 

 The defense objected to this statement on the grounds that it misstated trial testimony. The court instructed the jury to rely on their notes regarding this point. Sherman does not challenge this ruling in this appeal.
 

 [5]
 

 Sherman also argues that the jury instructions regarding implied malice and defining premeditation, willfulness, and deliberation were constitutionally defective. However, this court has explicitly upheld these instructions; we decline to revisit the issue here.
 
 See
 
 Greene v. State, 113 Nev. 157, 167-68, 931 P.2d 54, 60-61 (1997); Guy v. State, 108 Nev. 770, 777, 839 P.2d 578, 582-83 (1992).